# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    **v.**                        **Case No. 04-CR-122**

**RONALD A. ARTHUR and**
**MARY K. ARTHUR a/k/a KATHLEEN M. ARTHUR,**
        **Defendants.**

---

## FINDINGS OF FACT AND VERDICT

Defendants Ronald and Mary (a/k/a Kathleen) Arthur were charged in a twenty-six count indictment with bankruptcy fraud and money laundering charges. Defendants waived their right to trial by jury and consented to a trial by the court, and the government acquiesced in the jury waiver. See Fed. R. Crim. P. 23(c). Defendants requested that the court make findings of fact under Rule 23(c). Those findings and the court's verdict follow.

## I. FINDINGS OF FACT

### A.    Background

At all relevant times, defendants were husband and wife, residing at 1085 Saratoga Lane, Lake Geneva, Wisconsin. Both were attorneys. On or about February 18, 2000, defendant Ronald Arthur executed a bankruptcy petition and accompanying schedules, which were filed in the United States Bankruptcy Court for the Eastern District of Virginia on March 28, 2000. (Govt. Ex. 1.) The matter was transferred to the Eastern District of Wisconsin in the summer of 2000 on the motion of the trustee in Virginia. (Govt. Ex. 6.)

The government alleged that defendants conspired to conceal Mr. Arthur's assets

from the bankruptcy trustee and his creditors (count 1). The government further alleged that Mr. Arthur made various false oaths or accounts during the pendency of the bankruptcy proceedings (counts 3-10), that Mrs. Arthur unlawfully received debtor property after the filing of the petition (counts 11-15), and that Mrs. Arthur submitted a false claim in the bankruptcy proceedings in the amount of $650,000 for legal services she allegedly rendered to Mr. Arthur (count 16).[1] Finally, the government alleged that the defendants conspired to commit money laundering (count 2), as well as committing various substantive money laundering offenses (counts 17-26),[2] regarding the proceeds of the bankruptcy fraud.

Before proceeding to the specific offenses charged, I will make some preliminary findings. Defendants in this case entered into a series of Martial Property Agreements ("MPA's"), pursuant to which Mr. Arthur purported to transfer his interest in most individually and jointly owned assets, as well as after-acquired assets and income, to Mrs. Arthur. (Govt. Ex. 57.) The first such agreement was purportedly executed on January 2, 1995, and subsequent agreements purportedly executed on August 1, 1995, and January 2, 1997. An unsigned copy of a document entitled "Revocable Trust Agreement" and dated January 31, 1999, was also submitted in evidence. (Govt. Ex. 57.) Defendants also created and/or controlled several corporate entities, including Greystone Communications, Inc., Xtant Foundation, Inc., and Scientiquities, Inc.

---

[1] Mr. Arthur was also charged in counts 11-16 pursuant to 18 U.S.C. § 2.

[2] Mr. Arthur alone was charged in counts 17-23. Both defendants were charged in counts 24-26.

2

The evidence demonstrated that both the corporate entities and the MPA's were shams. First, although defendants claimed that the corporate entities were created either for legitimate business purposes (e.g., Scientiquities to sell replicas of artifacts and Xtant to sell recycled paper) and/or for the benefit of defendants' daughter, Elizabeth, the evidence showed that none of these entities conducted any real business or established anything for Elizabeth. Rather, they were used to hold defendants' income and assets in an attempt to conceal them from their creditors, and to pay defendants' personal expenses.

Second, although defendants presented expert testimony that the MPA's were not invalid on their faces, they bore many of the "badges of fraud" testified to by Bankruptcy Judge McGarrity: Mr. Arthur transferred property to Mrs. Arthur yet retained use and control of it; transactions were made in anticipation of a judgment against Mr. Arthur; and the transfers made Mr. Arthur, on paper, appear to be insolvent. Further, defendants did not act in accordance with the MPA's (or consistently with the legal separation granted them by a state court in 2001). Mr. Arthur retained his interest in the property, assets and income purportedly transferred to Mrs. Arthur as if there were no MPA's. He continued to live with Mrs. Arthur in their Lake Geneva home; defendants continued to take trips together to Europe and Las Vegas; and Mr. Arthur wrote virtually all of the checks on the bank accounts containing funds that, according to the MPA's, should have belonged to Mrs. Arthur. Mrs. Arthur testified that she approved each and every one of the checks Mr. Arthur wrote, but based on my observation of her demeanor her testimony was not credible. Moreover, defendants' tax returns did not reflect any of the transfers from Mr. Arthur to Mrs. Arthur or the fact that Mr. Arthur's income supposedly belonged to Mrs. Arthur; instead, he reported more income than she did in 1995 and 1996. (Govt. Ex. 137.)

3

Finally, the evidence showed that the MPA's were created after the fact. No transfer of assets pursuant to the MPA's was recorded until May of 1997, at which time Mr. Arthur was involved in a hearing on damages with Barbara Doyle, who had previously obtained a default judgment against him related to damages he and some loggers with whom he was associated (the Keefes) had caused to her property.[3] Subsequently, Mr. Arthur became involved in acrimonious litigation with the Keefes. The evidence demonstrated that defendants conspired to hide Mr. Arthur's assets from Doyle and the Keefes, and for such purpose created the MPA's and utilized the shell corporate entities. Thus, based on my assessment of the credibility of defendants in light of the surrounding circumstances,[4] I find that defendants did not reasonably believe that pursuant to the MPA's virtually all of Mr. Arthur's assets had legitimately passed to Mrs. Arthur such that he did not have to disclose them in the bankruptcy proceeding.

With these findings in mind, I turn to the counts alleged in the indictment. I address first the bankruptcy fraud counts, followed by the money laundering counts.

## B. Bankruptcy Fraud Counts

### 1. Count 1: Conspiracy

Count 1 alleged that between February 2000 and October 2002, defendants conspired to commit offenses against the United States in relation to the bankruptcy

---

[3] The 1995 date of the first MPA conveniently placed the transfers referenced therein beyond the four year "look back" period for fraudulent conveyances.

[4] Although Mr. Arthur did not testify at trial, I was able to evaluate his credibility based on his sworn testimony at the meetings of creditors held pursuant to 11 U.S.C. § 341 during the bankruptcy proceedings. A tape recording of these meetings was played during the trial. His testimony was consistently evasive and entirely unbelievable.

proceeding, to wit: making false oaths and accounts, 18 U.S.C. § 152(2); making false declarations and statements under penalty of perjury, § 152(3); presenting fraudulent claims, § 152(4); and fraudulently receiving property from the debtor, § 152(5); all contrary to 18 U.S.C. § 371.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To sustain the charge of conspiracy, the government must prove: (1) that the conspiracy as charged in Count 1 existed; (2) that defendants knowingly became members of the conspiracy with an intention to further the conspiracy; and (3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy. A conspiracy may be established even if its purpose was not accomplished. Further, it is not necessary that all the overt acts charged in the indictment be proved, and the overt act proved may itself be a lawful act. Finally, to be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which its purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant. Federal Criminal Jury Instructions of the Seventh Circuit § 5.08, at 81 (1999).

The government proved each of these elements beyond a reasonable doubt. The evidence showed that defendants conspired to hide Mr. Arthur's assets and income from the bankruptcy trustee and his creditors by transferring them out of his name to Mrs. Arthur or one of the corporate entities defendants' controlled, but that he continued to exercise control of and enjoy the benefits of such assets and income. The government also proved that defendants committed numerous overt acts in furtherance of the conspiracy, as

5

alleged in the indictment.[5]  See United States v. Marren, 890 F.2d 924, 933 (7th Cir. 1989) (holding that intent, as well as the agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts,  and the totality of their conduct).

First, the government proved that prior to the filing of his petition Mr. Arthur was performing services for Rex Runzheimer, which he failed to disclose on his petition and during his testimony under oath at two § 341 meetings of creditors.  Specifically, Mr. Arthur submitted an invoice to Runzheimer dated December 28, 1999, for work performed from October 16, 1999 through the date of the invoice, in the amount of $43,675.  (Govt. Ex. 81.)  The invoice was submitted under the name of "Arthur & Arthur," a firm Mrs. Arthur purportedly owned, but Mr. Arthur requested on the invoice that payment be made to Xtant Foundation, Inc., "as an accommodation to Arthur & Arthur."  (Govt. Ext 81.)  Runzheimer made the check payable to Xtant (Govt. Ex. 97), and on or about February 10, 2000, Mr. Arthur deposited the check in the Xtant Foundation's bank account Crestar Bank (Govt. Ex. 148).  The evidence showed that Mr. Arthur controlled this account and signed virtually all of the checks drawn on it.  (Govt. Ex. 148.)  These transactions furthered the conspiracy by hiding Mr. Arthur's substantial pre-petition income from the trustee and the creditors.

_____

[5]Some of the overt acts charged in count 1 are also later charged as substantive offenses, i.e. count 1 ¶ 15 corresponds to count 3 (failure to disclose assets and payments to creditors), count 1 ¶ 16 corresponds to counts 4 and 14 (pension funds from Godfrey & Kahn), count 1 ¶ 18 corresponds to count 3 ¶ G (account receivable from Thompson Consulting), count 1 ¶ 22 corresponds to counts 3-7 (Mr. Arthur's false testimony during the September 12, 2000 § 341 meeting, at which Mrs. Arthur was present), count 1 ¶ 25 corresponds to count 13 (deposit of $55,000 into the Arthur & Arthur bank account for work Mr. Arthur performed for Runzheimer).  To avoid repetition, I incorporate my discussion of those substantive counts herein by reference.

6

Second, the government proved that Mr. Arthur signed his bankruptcy petition on or about February 18, 2000, listing his address as 11204 Lagoon Lane, Reston, Virginia. The petition was filed on March 28, 2000. As discussed in § I.B.2.a.A., infra, the evidence demonstrated that Mr. Arthur actually lived at 1085 Saratoga Lane, Lake Geneva, Wisconsin at this time. (Govt. Ex. 82, 145.) Mr. Arthur claimed during the bankruptcy proceeding that he could be a co-resident of Wisconsin and Virginia. (Govt. Ex. 64A.) However, the government proved that by selecting venue in Virginia, which does not require disclosure of the assets of a non-filing spouse, as opposed to Wisconsin, which does, Mr. Arthur sought to further the conspiracy by hiding assets transferred to Mrs. Arthur and/or entities she nominally directed or controlled.

Third, on or about February 25, 2000, Mr. Arthur purchased a 1998 Honda Civic using a $12,558.82 check drawn on the Xtant Foundation Crestar bank account. (Govt. Ex. 15, 15C.) The address listed on the check was 1085 Saratoga Lane, Lake Geneva, Wisconsin, and Mr. Arthur signed the purchase agreement both individually and on behalf of Xtant. (Govt. Ex. 15A.) However, the vehicle was registered to Xtant. (Govt. Ex 15 #001564.) By using Xtant funds and titling the car in Xtant's name, Mr. Arthur furthered the conspiracy by hiding this asset from the trustee and his creditors.[6]

Fourth, on or about March 15, 2000, Mr. Arthur made a mortgage payment in the amount of $4484.40 on defendants' home at 1085 Saratoga Lane, Lake Geneva, using the Xtant Foundation Crestar bank account. (Govt. Ex. 148.) The funds in this account were

---

[6]Susan Svoboda, Mr. Arthur's sister and a listed director of Xtant, testified that this vehicle was to be used to drive to the paper mill to pick up paper for Xtant's business. Based on her evasive demeanor and responses, I found her testimony incredible. Xtant did no business, and a Honda Civic would not plausibly be used to haul paper.

7

largely derived from Mr. Arthur's work for Runzheimer, which he failed to disclose to the bankruptcy trustee. Mr. Arthur further denied under oath contributing any funds toward payment of this mortgage. (Govt. Ex. 64A.) This act furthered the conspiracy by concealing Mr. Arthur's income and his interest in the Saratoga Lane property.

Fifth, on March 20, 2000, Mr. Arthur made a payment of $10,000 on his MBNA credit card using the Xtant Crestar bank account. (Govt. Ex. 148.) This act furthered the conspiracy by allowing Mr. Arthur to continue the use and enjoyment of the Runzheimr earnings he placed in the Xtant account, thereby hiding such income from the trustee and his creditors. Mr. Arthur also failed to disclose his credit cards on his petition and schedules, which allowed him to continue using them, including on a trip to Europe he took with Mrs. Arthur and their daughter from approximately March 22, 2000 to April 3, 2000, during which time the time the bankruptcy petition was filed. (Govt. Ex. 133 #000342-45.)

Sixth, on May 11, 2000, one day before he was scheduled to testify under oath at a § 341 meeting of creditors in the Virginia bankruptcy proceeding, Mr. Arthur transferred $32,998.01 from the Xtant Crestar account (Govt. Ex. 148) to a new Xtant account he had opened at Wachovia Bank (Govt. Ex. 149). On that same date, he deposited a check from Runzheimer in the amount of $46,250 into the new Wachovia account. (Govt. Ex. 149.) This Runzheimer check represented payment for Mr. Arthur's services from January 1, 2000 through April 30, 2000. (Govt. Ex. 82.) Again, Mr. Arthur submitted the invoice to Runzheimer under the name of Arthur & Arthur but asked that payment be made to Xtant "as an accommodation to Arthur & Arthur." (Govt. Ex. 82.) Runzheimer obliged. (Govt. Ex. 98.) This act furthered the conspiracy by continuing to hide Mr. Arthur's earnings from Runzheimer from the trustee and his creditors.

8

Seventh, on May 12, 2000, at the § 341 meeting in Virginia, Mr. Arthur provided false testimony under oath by stating that he had listed all of his assets in the bankruptcy schedules. I incorporate by reference herein my findings on count 3 below, which detail many of the omissions from the schedules. Mr. Arthur also falsely denied having any control over the Xtant Foundation, when in fact he controlled the Xtant accounts and wrote virtually all of the checks on them. (Govt. Ex. 148, 149.) Mr. Arthur attempted to state that only a director has control and that he was not a named director of Xtant. However, the evidence clearly demonstrated that although Svoboda, Mrs. Arthur and Edward Sadler (Mrs. Arthur's half-brother) were listed as directors, Mr. Arthur controlled Xtant's bank accounts, and Xtant conducted no business other than holding defendants' funds (particularly, Mr. Arthur's Runzheimer income). Further, Sadler testified that he had no idea he had been listed as a director and that he had no involvement in running Xtant. Based on their demeanor and all of the circumstances of the case, I found the testimony of Svoboda and Mrs. Arthur that they approved all of the checks Mr. Arthur wrote on the Xtant acounts to be incredible. By testifying that he had disclosed all of his assets and denying control of Xtant, Mr. Arthur furthered the conspiracy.

Eighth, on or about June 9, 2000, defendants purchased a SEA DOO personal water-craft, using a check in the amount of $9502.49 drawn on the Xtant Wachovia account. (Govt. Ex. 19-21; Govt. Ex. 149 at 2.) This transaction is discussed in greater detail in connection with count 12 below, and I incorporate that discussion herein by reference. The testimony of Kymberli Reindl of Rob's Performance Motorsports established that Mrs. Arthur requested that the craft be titled in the name of the Xtant

9

Foundation, which furthered the conspiracy by continuing to hide Mr. Arthur's income and use of that income for his and his family's benefit from the trustee and his creditors.

Ninth, on or about December 18, 2000, Mrs. Arthur filed, on behalf of herself and Runzheimer, a motion to prevent creditors (the Keefes) from examining and obtaining documents from Runzheimer and her. (Govt. Ex. 55.) The purpose of this motion, which pitted one creditor (Mrs. Arthur) against another (the Keefes), was to prevent the Keefes and the trustee from discovering the concealment of Mr. Arthur's assets and income.

Tenth, on or about April 12, 2001, Mr. Arthur opened a bank account for Greystone Communications at Bank One into which Mrs. Arthur deposited a bank check drawn from Citizen's Bank of Mukwonago in the amount of $35,000 (Govt. Ex. 129 #001077; Govt. Ex. 151 at 2; Govt. Ex. 151 at 1.) The source of this $35,000 check was a payment on behalf of Runzheimer in the amount of $55,000 for Mr. Arthur's services. (Govt. Ex. 151 at 1; see also Govt. Ex. 83; Govt. Ex. 99.) This $55,000 check, made payable to Arthur & Arthur (Govt. Ex. 99), was originally deposited into the Arthur & Arthur checking account at Citizen's Bank on or about March 20, 2001 (Govt. Ex. 151 at 1) and then transferred to an Arthur & Arthur money market account at Citizen's Bank (Govt. Ex 151 at 2). Mrs. Arthur then pulled out $35,000 from the Citizen's Bank money market account and transferred it to the Greystone account over which Mr. Arthur had signatory authority. By transferring funds Mr. Arthur earned between these various accounts defendants furthered the conspiracy by continuing to hide income from Runzheimer from the trustee and creditors.

Eleventh, Mr. Arthur continued to use the Greystone account at Bank One to deposit his earnings from Runzheimer. Specifically, on February 15, 2002, he deposited a check from Runzheimer in the amount of $58,000 and on October 15, 2002, a Runzheimer check

10

in the amount of $27,000.  (Govt. Ex. 152 at 2; <u>see also</u> Govt. Ex. 101; Govt. Ex. 105.)[7]

These Runzheimer/Waterford checks were made payable to Greystone based on the invoices Mr. Arthur submitted under the name of Greystone Communications.  (Govt. Ex. 85, 89.)  However, as Rex Runzheimer testified, Mr. Arthur performed all of the work upon which these payments were based; Runzheimer stated that he did not know what Greystone was.  By having payments made to Greystone, Mr. Arthur continued to conceal his work and income from the trustee and his creditors.[8]

Therefore, based on all of these acts and the circumstances surrounding them, the government proved the elements of conspiracy under § 371 beyond a reasonable doubt.

### 2.    Count Three: False Oath or Account

Count three alleged that on or about September 12, 2000, Mr. Arthur made a false oath or account while testifying under oath during a meeting of creditors conducted pursuant to 11 U.S.C. § 341(a).  Specifically, it alleged that Mr. Arthur falsely responded "yes" when asked whether the information contained in his petition and schedules was true and accurate, when in fact he had made several materially false declarations.

The elements of this offense are: (1) a proceeding in bankruptcy existed under Title 11; (2) the defendant made an oath or account in relation to the bankruptcy proceeding; (3) the oath or account related to some material matter; (4) the oath or account was false;

_____

[7]These checks were from the account of Waterford Centre, LLC, an entity created by Runzheimer in connection with a business park development on which Mr. Arthur was working.

[8]The Runzheimer checks involved in overt acts 10 and 11 represented post-petition earnings.  However, the conspiracy charged continued until October 2002, and Mr. Arthur furthered the conspiracy by continuing to hide his substantial pre- and post-petition income from Runzheimer during this period of time.

11

and (5) the defendant made such oath or account knowingly and fraudulently. Federal Criminal Jury Instructions of the Seventh Circuit 135 (1999).

A statement is material if it had the effect of influencing the court, the trustee, or the creditors, or was capable of or had the potential to do so. It is not necessary that the statement actually have that influence or be relied on by the court, the trustee, or the creditors, so long as it had the potential or capability to do so. Materiality does not require a showing that creditors were harmed by the false statement. Id. at 136. "Knowingly" means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case. Id. at 60. An act is done fraudulently if done with intent to deceive any creditor, trustee or bankruptcy judge. Id. at 131.

The government proved each element beyond a reasonable doubt. I will address each false declaration on the petition and schedules in turn, before turning to the other elements of the offense charged.

### a. False Statements in Petition and Schedules

### A.[9] Residence

On the cover page of the petition, Ronald Arthur identified his residence as 11204 Lagoon Lane, Reston, Virginia. (Govt. Ex 1.) The evidence showed that this was the residence of Mr. Arthur's sister, Susan Svoboda, and that while Mr. Arthur may have from time to time stayed with his sister in Virginia, his actual residence was 1085 Saratoga

---

[9]I will letter each statement to correspond to the lettered paragraphs in the indictment.

Case 2:04-cr-00122-LA   Filed 11/07/05   Page 12 of 48   Document 76

Lane, Lake Geneva, Wisconsin. For instance, exhibit 145 includes a copy of Mr. Arthur's Wisconsin driver's license, issued on March 17, 2000 (eleven days before he filed the bankruptcy petition), which lists his address as 1085 Saratoga Lane, Lake Geneva, Wisconsin. The witnesses who testified as to their business dealings with Mr. Arthur during this time period, including Rex Runzheimer, David Kamm and Edward Sadler, indicated that defendant was living in Wisconsin. Mr. Arthur's invoices to Runzheimer for work performed demonstrated that Mr. Arthur was in Wisconsin most days in the latter half of 1999 and early 2000. (Govt. Ex. 79-80.) On October 15, 1999, defendant filed a lawsuit declaring that he was a resident of the Geneva National real estate development in Walworth County (Govt. Ex. 16), which he failed to disclose on his petition and schedules (Govt. Ex. 1). Finally, Mr. Arthur's credit card records indicated that his purchases were substantially all in Wisconsin and Northern Illinois; only a few were in Virginia. (See Govt. Ex. 133-35.)

The only witness who testified as to Mr. Arthur's presence in Virginia during this time was Svoboda, and based on her evasive demeanor and responses, I found her testimony not credible. Mrs. Arthur also attempted to testify that Mr. Arthur was in Virginia at least part of the time, but based on my observation of her demeanor her testimony was also incredible. Further, she was impeached when a letter she purported to send to Mr. Arthur in Virginia on March 15, 2000 (Govt. Ex. 51), was compared to the Runzheimer invoices which showed that Mr. Arthur attended a meeting in Wisconsin on that date (Govt. Ex. 82 at 3). The evidence also showed that on March 16, 2000 Mrs. Arthur filed a bogus lawsuit against Mr. Arthur listing his address in Reston, Virginia. (Govt. Ex. 167.) Mrs. Arthur

13

admitted that Mr. Arthur participated in drafting both of these documents, which purported to be adversarial in nature.

## B. Interest in Real Property

In Schedule A of the petition, Mr. Arthur stated that he had no interest in any real property.  (Govt. Ex. 1 #002360.)  The evidence demonstrated that Mr. Arthur retained a beneficial interest in the property at 1085 Saratoga Lane, Lake Geneva, Wisconsin.  He resided there prior to filing the bankruptcy petition, up to the date of trial.  Further, the evidence showed that Mr. Arthur initially caused the property to be listed in the name of Halco Financial and Realty Corp., an entity of which Mr. Arthur was president, and later to be transferred to Mrs. Arthur.  Yet, nothing changed for him.  He continued to live in the house.  Further, he was a personal guarantor on the loan for the property (Govt. Ex. 18C) and made payments on the mortgage and property taxes for the home via the Xtant accounts containing his Runzheimer income (Govt. Ex. 148, 149).

## C. Bank Accounts

Mr. Arthur stated that he had $50 in a checking account.  (Govt. Ex. 1 #002361.) He failed to disclose that he had control over the Xtant account at Crestar Bank with a balance of $49,460.50 as of the end of February 2000.  (Govt. Ex. 10 #001168.) Mr. Arthur used this account to write checks for his personal expenses.  (Govt. Ex. 10, 148.)  The evidence showed that he wrote virtually all of the checks on this account.  While Svoboda and Mrs. Arthur testified that one of the three directors of the corporation (Mrs. Arthur, Svoboda, and Sadler) had to approve the checks, I found their testimony incredible.

14

Sadler credibly testified that he had nothing to do with approving Xtant expenditures, and that he was unaware that he was even listed as an officer or director of the corporation.

### D.    IRA, ERISA, Pension or Profit Sharing Plans

Mr. Arthur denied any interest in an IRA or pension plan.  (Govt. Ex. 1 #002361.)  In fact, Mr. Arthur had an interest in the Godfrey & Kahn Pension Plan worth more than $27,000 (Govt. Ex. 34) and an IRA with Paine Webber worth more than $24,000 (Govt. Ex. 121).  Joyce Williamson testified that Mr. Arthur was notified of his interest in the Godfrey & Kahn plan in late 1999, yet he failed to disclose it on his petition and schedules in early 2000.  Defendants argued that these assets were transferred to Mrs. Arthur pursuant to the MPA's, but as set forth above these alleged transfers were a sham.  Mr. Arthur maintained his interest in and control of these assets.

### E.    Stocks

Mr. Arthur denied owning any stocks.  (Govt. Ex 1 #002362.)  In fact, he owned 110 shares in "The Money Group."  (Govt. Ex. 122.)  As with the assets Mr. Arthur failed to disclose as listed in ¶ D., I reject the contention that these stocks were transferred to Mrs. Arthur pursuant to the MPA's.  As further evidence of concealment, the government showed that Mr. Arthur cashed his dividend checks until shortly before he filed for bankruptcy, at which point he stopped.

### F.    Interests in Partnerships and Joint Ventures

Mr. Arthur denied any interests in partnerships or joint ventures (Govt. Ex. 1 #002362), when in fact he had an interest in G & K Investments # 6 (Govt. Ex. 23-25), the G & K Findley Adhesives Investment (Govt. Ex. 30-33), and a joint venture in timber with

15

Dennis Boschi (Govt. Ex. 35-37). For the reasons set forth above, I reject the contention that these interests were transferred to Mrs. Arthur pursuant to the MPA's. As further evidence of concealment, the government showed that Mr. Arthur had Boschi write the check for his payout on the timber investment to Arthur & Arthur as "legal fees," when in fact it had nothing to do with legal work. (Govt. Ex. 37.)

### G. Accounts Receivable

Mr. Arthur denied any accounts receivable (Govt. Ex 1 #002362) when in fact he had an amount due from Thompson Consulting, which was paid on or about April 26, 2000 (Govt. Ex. 22). David Welnetz of Thompson testified that this payment was for legal services performed by Mr. Arthur over the previous year. For the reasons set forth above, I reject the contention that this account receivable actually belonged to "Arthur & Arthur" owned by Mrs. Arthur.

### H. Interests in Estate of a Decedent

Mr. Arthur denied any interest in the estate of a decedent (Govt. Ex. 1 #002362) when in fact he was acting as personal representative of the estate of Evelyn Radke, which was worth more than $2,000,000 (Govt. Ex. 38, 39, 41A; <u>see also</u> Govt. Ex. 132, 144). Attorney Robert Peregrine, who assisted Mr. Arthur in the administration of the estate, testified that a personal representative is entitled to a 2% interest in the estate as payment for his services. According to the Final Account filed in Milwaukee County Circuit Court, Mr. Arthur was entitled to a fee of $28,000. (Govt. Ex. 41B; <u>see also</u> Govt. Ex. 42, 43.) Although the fee was received after Mr. Arthur filed for bankruptcy, his interest in the estate was established in 1998, when he became personal representative. (Govt. Ex. 38.) For

16

the reasons set forth above, I do not find credible the contention that Mr. Arthur reasonably believed he did not have to disclose this interest based on the MPA's.

### I.    Contingent and Unliquidated Claims

Mr. Arthur listed various suits he had pending (Govt. Ex. 1 #002362-63) but omitted an action entitled <u>Arthur et al. v. Paloma Lake Geneva National, LLC, et al.</u>, Case No. 99-CV-0681, filed in Walworth County Circuit Court (Govt. Ex. 16). In that action, Mr. Arthur indicated that he resided in Walworth County, Wisconsin and that he and others similarly situated were "the true owners" of the Geneva National Golf Club. (Govt. Ex. 16 [Complaint] at 1, 11.)

### J.    Automobiles

Mr. Arthur stated that he owned a 1993 Jeep with 200,000 miles (Govt. Ex. 1 #002363) but failed to disclose that he also owned a 1999 Chevrolet Trail Blazer, which he purchased in August 1999 with Xtant funds (Govt. Ex. 14, 14B). Mr. Arthur's name appeared on the title of this vehicle, along with Xtant Foundation. (Govt. Ex. 139.)

### K.    Income from Employment

Mr. Arthur listed his income from the previous two years as $11,500. (Govt. Ex. 1 # 002381.) In fact, he had been employed by Rex Runzheimer and Runzheimer International from December 1998 through the date of filing, during which time he earned more than $60,000.[10] (Govt. Ex. 78-82.) The invoices submitted during this period of time were under the name of Arthur & Arthur. However, Mr. Arthur directed that payment be

---

[10]The invoices through December 28, 1999, totaled $58,250. On or about April 30, 2000, Mr. Arthur submitted an invoice for the period commencing January 1, 2000, in the amount of $46,250. Some of this represented work completed prior to the signing of the petition on February 18, 2000 and its filing on March 28, 2000.

17

made to the Xtant Foundation as "accommodation" to Arthur & Arthur. Mr. Arthur controlled the funds in the Xtant bank accounts and wrote virtually all of the checks on those accounts, which were used to pay defendants' personal expenses. (Govt. Ex. 148, 149.)

### L.    Payments to Creditors

Mr. Arthur denied making any payments to creditors of more than $600 in the ninety days preceding commencement of the case. (Govt. Ex. 1 # 002381.) However, he made payments of more than $15,000 on his credit cards on December 30, 1999, using the Xtant bank accounts he controlled. (Govt. Ex. 148.)

### M.    Payments to Insiders

Mr. Arthur denied making any payments to insiders in the one year preceding commencement of the case. (Govt. Ex 1 #002381.) The government contended that this was false based on Mr. Arthur's December 29, 1999 payment, drawn on the Xtant account, on the mortgage on defendants' Lake Geneva home. It is not clear from the evidence how this constituted a payment to an insider. Therefore, I will not rely on this overt act.

### N.    Property Owned by Another the Debtor Holds/Controls

Mr. Arthur denied that he held or controlled any property owned by another. (Govt. Ex. 1 # 002383.) In fact, he held and controlled the property located at 1085 Saratoga, Lake Geneva, Wisconsin, which was titled to Halco, a corporation of which he was president and which he controlled. (Govt. Ex. 18.) The property was later transferred to Mrs. Arthur, but defendant continued to live there, as before.

18

### O. Involvement with Businesses

Mr. Arthur denied involvement as an officer, director, partner or managing executive in any corporation. (Govt. Ex. 1 #002383.) Although set up so that others were the named directors, Mr. Arthur was clearly the managing executive of the Xtant Foundation. Svoboda's testimony that she, Mrs. Arthur and Sadler controlled Xtant as the directors was incredible. Sadler credibly testified that he was not an officer or director of Xtant, was not involved in the business of Xtant or approving expenditures, and that he never discussed being an officer with defendants and Svoboda.

### b. Elements

It is undisputed that there was a proceeding in bankruptcy, and Mr. Arthur made an oath or account during the § 341 meeting as detailed in the indictment and demonstrated by the testimony of Virginia George and as indicated in government exhibits 44 (tape of 9/12/00 § 341 hearing) and 45 (transcript of 9/12/00 § 341 hearing). The oath or account was material in that it had the potential to influence the court, the trustee and the creditors. The statement re-affirmed the false statements in the petition and schedules, which were also material. For instance, by stating in the petition that his residence was in Virginia, Mr. Arthur sought to avail himself of the local rules of the Virginia bankruptcy court, which the evidence showed do not require disclosure of the assets of a non-filing spouse. This allowed him to avoid disclosure of the various entities nominally controlled by Mrs. Arthur that held Mr. Arthur's assets and funds, as well as the other transfers of assets to Mrs. Arthur. Further, by hiding the specific assets listed above, Mr. Arthur impeded the ability of the trustee and the creditors to determine his assets. Even if his efforts were ultimately

19

unsuccessful, the statements were nevertheless material.  The response at the § 341 hearing and the statements in the petition were false, for the reasons listed above.  Finally, the circumstances demonstrate that Mr. Arthur made the statements knowingly and fraudulently in an effort to deceive the trustee, his creditors, and the court.  Mr. Arthur was aware of these assets because he continued to control them and enjoy their use.  Further, his evasiveness in responding to the trustee's questions, including his specious invocation of attorney client privilege on behalf of entities which were really his alter-ego, demonstrated that he did so fraudulently.  I specifically reject the notion that under the circumstances Mr. Arthur reasonably believed that his statements were true in light of the MPA's and his other arrangements with Mrs. Arthur and the shell corporations they controlled.

### 3.    Counts Four-Seven: False Oath or Account

Counts four through seven charge Mr. Arthur with additional false oaths or accounts during the September 12, 2000 § 341 meeting.  The elements of these charges are the same as in count three, listed above.

**Count four** alleged that Mr. Arthur falsely denied that he had any interest in any pension, profit sharing, IRA or similar plan.  The evidence showed that as of the time he signed and filed his petition he had an interest in the Godfrey & Kahn, S.C. Pension Plan worth $27,000+ (Govt. Ex. 34) and an IRA with Paine Webber worth more than $24,000 (Govt. Ex. 121).  The testimony of Joyce Williamson established that Mr. Arthur was notified of his interest in the G & K plan on or about October 1999, shortly before he signed his petition in February 2000.

20

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made an oath or account, as alleged.  (See Govt. Ex. 44, 45.)  The oath or account related to a material matter in that Mr. Arthur's failure to disclose this asset was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge. That no creditors were actually harmed is irrelevant.  The evidence set forth above demonstrated that the oath or account was false.  Finally, the evidence demonstrated that Mr. Arthur made the oath or account knowingly – he had been notified of his interest in the pension plan just a few months before filing and less than a year before the § 341 meeting – and that he did so to fraudulently conceal the asset from his creditors, the trustee and the court.

**Count five** alleged that defendant falsely denied being listed on the title of any motor vehicles not listed on the schedules.  The evidence showed that at the time he filed his petition and testified under oath at the § 341 meeting Mr. Arthur was in fact listed on the title to the 1999 Chevrolet Trailblazer.  (Govt. Ex. 139.)  The vehicle was transferred to defendants' daughter Elizabeth in 2005, but this was long after Mr. Arthur made the representation in the bankruptcy proceeding.

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made an oath or account, as alleged.  (See Govt. Ex. 44, 45.)  The oath or account related to a material matter in that Mr. Arthur's failure to disclose this asset was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge. That no creditors may actually have been harmed is irrelevant.  The evidence set forth

21

above demonstrated that the oath or account was false. Finally, the evidence demonstrated that Mr. Arthur made the oath or account knowingly – he purchased this vehicle on behalf of himself and the Xtant Foundation less than a year prior to his bankruptcy filing – and that he did so fraudulently in order to conceal the asset from his creditors, the trustee and the court.

**Count six** alleged that Mr. Arthur falsely denied that he had any employment. The evidence, and in particular the testimony of Rex Runzheimer and David Kamm, established that Mr. Arthur was working as a consultant/counselor to Runzheimer International beginning in December 1998 (Govt. Ex. 78) and continuing through the period of time when he filed his petition and testified at the September 12, 2000 § 341 meeting (Govt. Ex. 79-83). The invoices Mr. Arthur submitted for payment to Runzheimer prior to December 31, 2000 were under the name of Arthur & Arthur. (Govt. Ex. 78-83.) However, Runzheimer and Kamm testified that only Mr. Arthur provided any services. Further, although defendants argued that these were services provided by Mr. Arthur for the benefit of the firm of Arthur & Arthur, which was controlled solely by Mrs. Arthur, the evidence showed the contrary. The testimony of Runzheimer and Kamm, as well as the invoices received in evidence, demonstrated that Mr. Arthur requested that payment be made to Xtant Foundation, which he controlled. (Govt. Ex. 78-82.) The evidence, particularly the testimony of IRS Agent Steven Facik, showed that Mr. Arthur controlled the Xtant Foundation bank accounts, wrote virtually all of the checks on those accounts, and that the expenditures were of a personal nature; none were related to the alleged business of Xtant. (See Govt. Ex. 148-149.) Finally, the tax return information submitted by the government demonstrated that neither Mrs. Arthur nor Arthur & Arthur, S.C. accounted for

22

the income paid to Mr. Arthur by Runzheimer, as Agent Facik testified would be necessary if, for instance, an associate in a law firm turned compensation over to his employer-firm. (Govt. Ex. 137.)

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made an oath or account, as alleged.  (See Govt. Ex. 44, 45.)  The oath or account related to a material matter in that Mr. Arthur's failure to disclose this substantial income was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge.  The evidence set forth above demonstrated that the oath or account was false.  Finally, the evidence demonstrated that Mr. Arthur made the oath or account knowingly – he was actively employed by Runzheimer during all of the relevant times and earned more than $100,000 – and that he did so to fraudulently conceal the income from his creditors, the trustee and the court.

**Count seven** alleged that Mr. Arthur falsely denied paying anyone more than $600 in the ninety days before the bankruptcy case was filed.  The evidence demonstrated that Mr. Arthur, via the Xtant Foundation Crestar Bank account that he controlled, made a payment of $2976.52 to Tri City National Bank ("TCNB") on the mortgage for defendants' home at 1085 Saratoga Lane, Lake Geneva, WI, on December 29, 1999; made a payment of $7606.01 on his Traveler's credit card and $7814.02 on his Citibank credit card on December 30, 1999; and made payments of $3027.03 (Walworth County) and $2635.49 (Geneva Town Treasurer) for property taxes on defendants' Lake Geneva home on January 31, 2000.  (Govt. Ex. 148.)  The evidence further demonstrated that the primary

23

source of funds in the Xtant accounts at the relevant times was the income generated by Mr. Arthur's work for Runzheimer. (Govt. Ex. 157, 158.)

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made the oath or account alleged. (See Govt. Ex. 44, 45.) The oath or account related to a material matter in that Mr. Arthur's failure to disclose these payments was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge. The evidence set forth above demonstrated that the oath or account was false. Finally, the evidence demonstrated that Mr. Arthur made the oath or account knowingly – he signed the Xtant checks at issue – and that he did so to fraudulently conceal the payments and the income from which they came, as well as his credit cards and interest in property, from his creditors, the trustee and the court.

### 4. Counts Eight Through Ten: False Oath or Account

Counts eight through ten alleged false oaths or accounts by Mr. Arthur during an additional § 341 meeting held on February 2, 2001. The elements of these charges are the same as in count three, listed above.

**Count eight** alleged that Mr. Arthur falsely denied ever contributing any funds toward payment of the mortgage held by TCNB on the home at 1085 Saratoga Lane, Lake Geneva. The evidence showed that Mr. Arthur made such payments via the Xtant Foundation bank accounts he controlled (Govt. Ex. 148, 149, 150), which were funded primarily by funds he earned working for Runzheimer (Govt. Ex. 154, 158).

24

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made the oath or account alleged. (Govt. Ex. 64A.) The oath or account related to a material matter in that Mr. Arthur's failure to disclose these payments was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge. The evidence set forth above demonstrated that the oath or account was false. Finally, the evidence showed that Mr. Arthur made the oath or account knowingly – he signed the Xtant checks used to make the payments – and that he did so to fraudulently conceal the payments and the income from which they were derived, as well as his interest in the Lake Geneva property, from his creditors, the trustee and the court.

**Count nine** alleged that Mr. Arthur falsely denied contributing funds towards any real estate taxes owed for the Lake Geneva property. The evidence showed that Mr. Arthur made such payments via the Xtant Foundation bank accounts he controlled (Govt. Ex. 10 # 001204-05; Govt. Ex. 148), which were funded primarily by funds he earned working for Runzheimer (Govt. Ex. 154, 158).

It is undisputed that a proceeding in bankruptcy existed and that Mr. Arthur made the oath or account alleged. (Govt. Ex. 64A.) The oath or account related to a material matter in that Mr. Arthur's failure to disclose these payments was capable of or had the potential to influence the trustee in her administration of the estate, the creditors in their efforts to seek compensation, and the court in its decision whether to grant a discharge. The evidence set forth above demonstrated that the oath or account was false. Finally, the evidence showed that Mr. Arthur made the oath or account knowingly – he signed the Xtant checks used to make the payments – and that he did so to fraudulently conceal the

25

payments and the income from which they came, as well as his interest in the property, from his creditors, the trustee and the court.

**Count ten** pertained to Mr. Arthur's denial that he was "involved with a company called Runzheimer LLC, Inc." prior to the filing of the petition. (Govt. Ex. 64A, final page). It seems plain enough that the trustee was seeking to learn of Mr. Arthur's work for Rex Runzheimer and his entities, which began in December 1998 and continued through the date of the February 2, 2001 § 341 meeting. (Govt. Ex. 78-87.) The evidence showed that Mr. Arthur worked for "Runzheimer International" from December 1998 through April 2000. (Govt. Ex. 78-82.) Beginning in December 2000, Mr. Arthur began submitting his invoices to "Runzheimer Park, LLC." (Govt. Ex. 83.) Rex Runzheimer testified that the LLC entity was created on or about May 15, 2000 for the purpose of holding the new Runzheimer building within the business park he hoped to create. The evidence further showed that the business park development was approved by local officials in October 2000.

Although it is likely Mr. Arthur knew what the trustee was driving at, I cannot conclude beyond a reasonable doubt that Mr. Arthur knowingly made a false statement as alleged in count ten. "Runzheimer LLC, Inc." did not exist prior to the filing of the petition.

### 5. Counts 11-15: Receipt of Debtor Property

Counts 11-15 alleged that defendants received property from the debtor after the filing of the bankruptcy proceedings. The elements of the offenses are: (1) the defendant received a material amount of property from the debtor after the filing of a case under Title 11; (2) the defendant received such property with the intent to defeat the provisions of Title

26

11; and (3) such property was received knowingly and fraudulently.  18 U.S.C. § 152(5).

For each of these counts, the indictment also references 18 U.S.C. § 2, which provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The Seventh Circuit's Jury Instructions provide:

> Any person who knowingly aids, counsels, commands, induces or procures the commission of an offense may be found guilty of that offense. That person must knowingly associate with the criminal activity, participate in the activity, and try to make it succeed.

> If a defendant knowingly caused the acts of another, the defendant is responsible for those acts as though he/she personally committed them.

Federal Criminal Jury Instructions of the Seventh Circuit 78 (1999).

**Count 11** pertained to Mrs. Arthur's May 4, 2000 deposit of the $3350 check from Thompson Consulting (Govt. Ex. 22) into the bank account of Arthur & Arthur, an account over which she had sole signatory authority (Govt. Ex. 125, 151).  As discussed in reference to count 3 ¶ G. above, this amount was for an accounts receivable due Mr. Arthur for work he performed for Thompson prior to the filing of his bankruptcy petition; it should have been disclosed to the bankruptcy trustee and made part of the estate.  For the reasons set forth above, I find incredible defendants' assertion that this money was Mrs. Arthur's alone pursuant to the MPA's.

Mrs. Arthur received this material amount of property from the debtor after the bankruptcy petition was filed.  The evidence showed that Mr. Arthur induced or procured

27

Mrs. Arthur's conduct.[11]  Welnetz testified that although Mr. Arthur performed the work and advised him of the outstanding debt, Mrs. Arthur delivered the invoice.  The evidence demonstrated, consistent with their pattern of transferring and hiding assets, that Mrs. Arthur received such property with the intent to defeat the provisions of Title 11, and that such property was received knowingly and fraudulently.  I note further than Mrs. Arthur used these funds to make payments on Mr. Arthur's personal credit card with Citibank. (Govt. Ex. 151 at 1.)

**Count 12** pertained to defendants' June 2000 purchase of the SEA DOO personal water-craft, which was titled in the name of the Xtant Foundation and paid for with a check in the amount of $9502.49 drawn on Xtant's Wachovia account.  (Govt. Ex. 19-21.)  The original check was signed by Mr. Arthur but was returned by the bank.  (Govt. Ex. 20.)  Mr. Arthur then obtained a bank check from Wachovia in the amount of $9502.49 to pay for the SEA DOO.  (Govt. Ex. 21.)  The evidence demonstrated that the Xtant accounts were funded with income Mr. Arthur generated from his work for Runzheimer.  The evidence further demonstrated that Xtant had no legitimate business reason to purchase a personal water-craft and that the craft was instead purchased for use by the Arthurs personally. Svoboda and Mrs. Arthur testified that Mrs. Arthur had loaned money to Xtant, and that purchases such as this on the Xtant account merely represented her "taking back" the loan. Based on their demeanor, I found their testimony incredible.  Further, there was no documentation of any loan from Mrs. Arthur to Xtant.  Rather, the evidence showed that

---

[11]Although § 152(5) is focused on those who receive property from the debtor, which would seem to exclude debtors from its coverage, debtors can be charged with aiding and abetting a violation of § 152(5) under 18 U.S.C. § 2, as Mr. Arthur was here.  1-7 <u>Collier on Bankruptcy</u> ¶ 7.02[5][b] (15th ed. 2005).

Case 2:04-cr-00122-LA   Filed 11/07/05   Page 28 of 48   Document 76

Xtant was a shell corporation used by the Arthurs to conceal Mr. Arthur's income and assets, and to pay personal expenses. Mrs. Arthur also testified that it was her daughter Elizabeth who accompanied Mr. Arthur to purchase the SEA DOO. Although Rob Strauss of Rob's Performance Motorsports could not positively identify the female who came into his store, he testified that the two individuals appeared to be husband and wife and that the female was not a teenager (as Elizabeth was at the time). I find Strauss's testimony more credible than Mrs. Arthur's. Moreover, Strauss's then-assistant, Reindl, testified that the two people who came into the store appeared to be in their late 30s or early 40s, that she was provided with information that the sale was to Ron and Kathy Arthur of Saratogo Lane, Lake Geneva, and that Mrs. Arthur called the next morning and asked that the craft be titled in the name of the Xtant Foundation. Xtant had no need for a personal water-craft. Rather, it was used by defendants personally.

Defendants received this material amount of property from the debtor after the bankruptcy petition was filed.[12] The evidence demonstrated, consistent with their pattern of transferring and hiding assets, that defendants received such property with the intent to

---

[12]The funds in the Xtant Wachovia money market account used to purchase the SEA DOO were derived from Mr. Arthur's pre-petition income from Runzheimer, which he failed to disclose. (See Govt. Ex. 149 at 2.) The Wachovia account was originally opened with a transfer from the Crestar account, which at the time contained little more than Mr. Arthur's pre-petition Runzheimer earnings, specifically the $43,675 Runzheimer check deposited on February 10, 2000. (Govt. Ex. 148.) On May 11, 2000, Mr. Arthur transferred $32,298.01 from the Crestar account into a Wachovia checking account, and on that same date he deposited a $46,250 check from Runzheimer into that account. This $46,250 check represented compensation for work from January to April 2000, most of which pre-dated the filing of the petition. (See Govt. Ex. 82.) On May 31, 2000, $76,025.44 was transferred from the Wachovia checking account into a Wachovia money market account. (Govt. Ex. 149 at 2.) On June 19, 2000, $9502.49 was withdrawn from the money market account to pay for the SEA DOO. Thus, this asset was purchased with pre-petition funds that should have been disclosed so they could be made part of the estate.

29

defeat the provisions of Title 11, and that such property was received knowingly and fraudulently. For the reasons set forth above, I reject the argument that Mrs. Arthur could withdraw the funds in the Xtant account as repayment of an alleged loan she made to Xtant.

**Count 13** pertained to a March 20, 2001 deposit in the amount of $55,000 (Govt. Ex. 99; Govt. Ex. 151 at 1) into the Arthur & Arthur bank account relating to services Mr. Arthur had provided to Runzheimer and related entities from May 1, 2000 through December 31, 2000 (Govt. Ex. 83). The corresponding invoice from Mr. Arthur was under the name of "Arthur & Arthur." (Govt. Ex. 83.) Unlike previous invoices Mr. Arthur submitted to Runzheimer, this one did not request that payment be made to Xtant as "an accommodation" to Arthur & Arthur. (Govt. Ex. 78-82.) Rather, the check was made payable to Arthur & Arthur and deposited by Mrs. Arthur into the Arthur & Arthur bank account. (Govt. Ex. 125, 151.)

Because this transfer involved post-petition earnings, I cannot conclude that the government has proven this offense beyond a reasonable doubt. As Collier states regarding § 152(5):

> Although the statute does not explicitly use the term "property of the estate," that is undoubtedly what is meant. Otherwise, the statute would prohibit a debtor from passing title to those assets that an individual debtor does have clear title to, such as postpetition earnings from services, regardless of the amount. Transfers of those funds certainly are not the types of transfers prohibited by the statute. Rather, the statute makes it criminal to knowingly and fraudulently receive property the transferor, the debtor, does not have. The filing of a case under title 11 divests the debtor of all of his or her legal and equitable interests in property and, thus, even under civil law precedents, the debtor would have no power to transfer any such property. As a consequence, unless "property of the estate" is intended, the statute would seem to be overinclusive to its purpose.

30

1-7 <u>Collier on Bankruptcy</u> ¶ 7.02[5][a][i][B] (15th ed. 2005).

Although an argument can be made that receipt of the debtor's own property, if done for the purpose of defeating bankruptcy, should be included within the ambit of § 152(5), <u>cf.</u> <u>United States v. Messner</u>, 107 F.3d 1448, 1452 (10th Cir. 1997), I cannot conclude beyond a reasonable doubt that defendants knowingly and fraudulently violated this specific statute in receiving post-petition earnings.[13]

**Count 14** pertained to a $27,954 deposit Mrs. Arthur made into her M & I bank account on or about March 20 or 21, 2001 (Govt. Ex. 123), representing the proceeds of Mr. Arthur's interest in G & K Investment # 6 (Govt. Ex. 26). The evidence, including the testimony of Joseph Bernstein and Judith Fasig, revealed that Mr. Arthur initially attempted to have this check made payable to Mrs. Arthur, but Bernstein refused. Defendants "lost" the first two checks Godfrey & Kahn sent; ultimately, Mr. Arthur signed the third check over to Mrs. Arthur in March 2001, almost six months after it was sent.

Mrs. Arthur received this material amount of property from the debtor after the bankruptcy petition was filed,[14] and Mr. Arthur aided and abetted such receipt as set forth above. The evidence demonstrated, consistent with their pattern of transferring and hiding assets, that Mrs. Arthur received such property with the intent to defeat the provisions of Title 11, and that such property was received knowingly and fraudulently. For the reasons

---

[13]This, of course, does not mean that post-petition concealment of additional earnings from Runzheimer is not relevant to the conspiracy, which continued until October 2002, or the money laundering counts. I find only that the government has not proven beyond a reasonable doubt that defendants knowingly and fraudulently received debtor property as alleged in this count, contrary to § 152(5).

[14]Because this was a pre-petition asset that should have been disclosed, it clearly constitutes "property" within the meaning of § 152(5).

31

set forth above, I reject the argument that these investment proceeds belonged to Mrs. Arthur pursuant to the MPA's.

Count 15 pertained to a July 17, 2002 bank check in the amount of $5000 drawn on the Greystone Communications Bank One account and payable to Mrs. Arthur. (Govt. Ex. 123; 130 #001104, 001125.) The funds for this withdrawal from the Greystone account came from a check from Waterford Centre LLC in the amount of $19,000. (Govt. Ex. 130 #001126-27; Govt. Ex. 104; Govt. Ex. 152.) Such funds represented payment to Mr. Arthur for his services to Runzheimer.[15] (Govt. Ex. 154.) Mrs. Arthur deposited the $5000 into her personal M & I bank account. (Govt. Ex. 123.)

As with count 13, I cannot conclude that the government has proven that defendants knowingly and fraudulently received this debtor property, which consisted of post-petition earnings, beyond a reasonable doubt. As discussed in note 13, supra, however, this finding does not mean that post-petition conduct is immaterial as to other charged counts.

### 6. Count 16: False Claim

Count 16 alleged that Mrs. Arthur's $650,000 claim in bankruptcy for legal services she allegedly provided to Mr. Arthur was false. The elements of the offense are: (1) a proceeding in bankruptcy existed under Title 11; (2) the defendant personally or by agent presented a claim for proof against the estate of a debtor; (3) such claim was false; and (4) such claim was presented knowingly and fraudulently. Federal Criminal Jury

---

[15]This payment corresponded to an invoice in the amount of $24,000, but it appears that Runzheimer made the payments in two checks, one for $19,000 and the other for $5000. (Govt. Ex. 87.)

Case 2:04-cr-00122-LA   Filed 11/07/05   Page 32 of 48   Document 76

Instructions of the Seventh Circuit at 137 (1999).  The indictment also charged the offense under 18 U.S.C. § 2, which is discussed above.  See id. at 78.

On May 22, 2001, Mrs. Arthur submitted a claim in the amount of $650,000 in Mr. Arthur's bankruptcy proceeding.  (Govt. Ex. 65.)  In an attached "Stipulation Regarding Obligation for Professional Services," signed by both defendants, they indicated that Mrs. Arthur was entitled to $200,000 for her management services concerning 2904 W. Wells Street (a property Mr. Arthur formerly owned), $560,000 in fees for her work on the "Statewide Log and Lumbar Co." matter from August 1995 through March 15, 2000 ($10,000 per month), and $200,000 for her work concerning Mr. Arthur's dispute with the Keefes.  The total amount due was then reduced by $310,000, representing assets previously transferred to Mrs. Arthur from Mr. Arthur pursuant to the MPA.  (Govt. Ex. 65 at 3.)  The evidence demonstrated that the claim was false.  Mrs. Arthur was employed full-time as a nursing home administrator from 1997 to 2004; it is incredible that she was also performing legal work for her husband worth hundreds of thousands of dollars during this time.  I specifically reject as incredible Mrs. Arthur's testimony that she was so engaged.[16]

_____

[16]The conclusion is supported by the decision of the Wisconsin Court of Appeals in Roeming v. Peterson Builders, Inc., No. 97-3834, 1998 WL 481195, at *2 (Wis. Ct. App. Aug. 18, 1998), in which the court found that Mr. Arthur "'masqueraded' as an expert witness and attempted to circumvent the ethical difficulty presented by being both a lawyer and an expert witness by having his wife pretend to prosecute the case. He actually took control of the litigation. His wife, although an attorney, was employed as an administrator of a nursing home and took instruction from her husband throughout the case." (Govt. Ex. 168.) Mrs. Arthur's credibility was further undermined by her papers seeking to withdraw the false claim, in which she stated that she saw no hope of getting paid.  (Govt. Ex. 68.) However, by that time (if the MPA's were valid) Mrs. Arthur had already received hundreds of thousands of dollars from Mr. Arthur.

33

It is undisputed that a proceeding in bankruptcy existed under Title 11. Mrs. Arthur personally presented a claim against the estate of the debtor in that proceeding. The evidence demonstrated that by preparing the "Stipulation" attached to the claim Mr. Arthur aided, counseled, or procured the commission of an offense. The claim was, for the reasons set forth above, false. Finally, the evidence demonstrated that the claim was presented knowingly and fraudulently in an effort to elevate Mr. Arthur's debts.[17]

## C. Money Laundering Counts

### 1. Count 2: Money Laundering Conspiracy

Count 2 alleged that from February 2000 until on or about October 2002, defendants conspired to commit money laundering offenses, namely to conduct financial transactions with the proceeds of the bankruptcy fraud offenses, with the intent to promote such unlawful activities and to conceal and disguise the source and control of the proceeds of such unlawful activities, contrary to 18 U.S.C. § 1956(h). "To prove a conspiracy to launder money, the government must 'demonstrate that [the defendant] was knowingly involved with two or more people for the purpose of money laundering and that he [or she] knew the proceeds used to further the scheme were derived from an illegal activity.'" United States v. Turner, 400 F.3d 491, 496 (7th Cir. 2005) (quoting United States v. Gracia, 272 F.3d 866, 873 (7th Cir. 2001)). When a defendant joins a conspiracy, he or she joins an agreement rather than a group. United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir.

---

[17]The only fixed and liquidated debts Mr. Arthur listed were to his wife and Greystone, another entity defendants controlled. Further, the government demonstrated that Mr. Arthur asked Sadler, who performed contract work for Greystone, to prepare an invoice for work he performed for Mr. Arthur a/k/a Greystone long after the fact. The circumstances demonstrated that this invoice was also designed to drive up Mr. Arthur's liabilities on the petition.

34

1991). An agreement need not be explicit; a tacit agreement is sufficient and circumstantial evidence may be sufficient to prove the agreement. United States v. Clay, 37 F.3d 338, 341 (7th Cir. 1994). A conspiracy may be shown by evidence that the conspirator embraced the criminal objective of the conspiracy. United States v. Severson, 3 F.3d 1005, 1010 (7th Cir. 1993).

As is pertinent to this case, money laundering can involve financial transactions with the proceeds of unlawful activity conducted with the intent to promote the carrying on of unlawful activity, 18 U.S.C. § 1956(a)(1)(A)(i), or with the intent to conceal the source, ownership or control of the proceeds, § 1956(a)(1)(B)(i). Under these provisions, there should be some separation between the initial transaction from which illegal proceeds were derived and further transactions designed to conceal the source of those proceeds. Further, the mere spending of ill-gotten funds is not enough to sweep conduct within the money laundering statute; instead, subsequent transactions must be specifically designed to hide the provenance of the funds involved. United States v. Esterman, 324 F.3d 565, 570 (7th Cir. 2003). Certain types of transactions may be indicative of a design to conceal. "These include transactions surrounded in unusual secrecy, structured transactions, depositing ill-gotten funds into another's bank accounts, using third parties to conceal the real owner, or engaging in unusual financial moves which culminate in a transaction." Turner, 400 F.3d at 497.

The government proved this offense beyond a reasonable doubt. Defendants knowingly conspired with each other for the purpose of laundering the funds involved in the bankruptcy fraud offenses. As the above findings show, defendants conspired to conceal Mr. Arthur's assets from the trustee and the creditors. They transferred Mr. Arthur's

35

income and assets to third parties, deposited income into the bank accounts of shell corporations, then used those accounts to make payments on their home, cars, credit cards, the SEA DOO, and other personal expenses. Because they were involved in the underlying bankruptcy fraud, defendants knew the proceeds used to further the scheme were derived from illegal activity.

I incorporate by reference my findings on the specific money laundering offenses as additional findings on this count.

### 2.     Counts 17-23 (Mr. Arthur)

In counts 17-23, the government alleged that Mr. Arthur committed various specific money laundering offenses with the proceeds of the bankruptcy fraud offenses charged in Counts 1 and 3-10. The indictment charged Mr. Arthur with money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), which proscribes financial transactions conducted with the intent to promote the carrying on of specified unlawful activity, and § 1956(a)(1)(B)(i), which proscribes financial transactions designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. The government may elect to proceed under the former, the latter or both prongs of the money laundering statute, but the fact-finder should be clear on which prong the conviction rests.[18] See United States v. Jackson, 935 F.2d 832, 842 (7th Cir. 1991). In the present case, because the underlying unlawful activity involved concealment, further concealment

---

[18]In its proposed jury instructions, submitted prior to defendants' waiver of a jury, the government proposed instructing the jury that it could convict if it found that defendants conducted transactions to promote or conceal. (R. 61 at 30.) This also suggests that the government was proceeding under both sub-sections of the statute.

of the proceeds of such activity could constitute a violation of both prongs of the money laundering statute.

The elements of the offense under § 1956(a)(1)(A)(i) are: (1) the defendant knowingly conducted or attempted to conduct a financial transaction; (2) the property involved in the financial transaction in fact involved the proceeds of the offenses charged in Counts 1 and 3-10; (3) the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) the defendant engaged in the financial transaction with the intent to promote the carrying on of the offenses charged in Counts 1 and 3-10. Federal Criminal Jury Instructions of the Seventh Circuit 304 (1999). The first three elements of the offense under § 1956(a)(1)(B)(i) are the same at with § 1956(a)(1)(A)(i); the fourth is that the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity charged in Counts 1 and 3-10. Id. at 306.

**Count 17** pertained to Mr. Arthur's February 25, 2000 purchase of the 1998 Honda Civic using funds from the Xtant Crestar bank account. (Govt. Ex. 15, 159.) Although this transaction occurred before Mr. Arthur's petition was filed on March 28, 2000, it did occur after the petition was signed on February 18, 2000. (Govt. Ex. 1.) "[T]here is no requirement that the entire fraudulent scheme be complete before the defendant starts laundering the proceeds from early portions of the scheme." United States v. Seward, 272 F.3d 831, 837 (7th Cir. 2001). The Seventh Circuit has noted that the proceeds of a completed phase of an ongoing offense can be laundered even if the money laundering transaction can also be considered a part of the continuing specified unlawful activity, and

Case 2:04-cr-00122-LA   Filed 11/07/05   Page 37 of 48   Document 76

that "money laundering can be a critical element in a complex fraud scheme because it helps keep the scheme afloat and helps disguise the source of the fraud proceeds." Id.

The government proved all of the elements of the offense beyond a reasonable doubt. Mr. Arthur conducted this financial transaction, which involved the transfer of title of a vehicle, with Ed Napleton Acura. (Govt. Ex. 15A.) The transaction involved the proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which he failed to disclose on his bankruptcy petitions and schedules. (Govt. Ex. 1, 159.) Mr. Arthur knew that the funds used in the transaction represented the proceeds of his fraud: he caused a Runzheimer check in the amount of $43,675 to be deposited into the Xtant Crestar account on or about February 10, 2000 (Govt. Ex. 148), the bankruptcy petition was signed on February 18, 2000 (Govt. Ex. 1), and the instant transaction occurred on or about February 25, 2000. Finally, the circumstances, particularly the use of the Xtant account to make the purchase and the titling of the vehicle in Xtant's name, demonstrated the Mr. Arthur knew that the transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10. The evidence further showed that Mr. Arthur engaged in the financial transaction with the intent to promote the ongoing concealment of his assets and income as charged in Counts 1 and 3-10. This transaction was separate from the underlying fraud and did not simply involve depositing ill-gotten funds into a bank account and openly spending them.

**Count 18** pertained to a March 15, 2000, payment of $4484.40 to TCNB on the mortgage on defendants' home at 1085 Saratoga Lane, drawn on the Xtant Crestar bank account. (Govt. Ex. 148, 159.) The government proved all of the elements of the offense

38

beyond a reasonable doubt. Mr. Arthur signed the check on the Xtant account and conducted this financial transaction with TCNB, a financial institution. (Govt. Ex.10 #001210.) The transaction again involved the proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which Mr. Arthur failed to disclose on his bankruptcy petitions and schedules. (Govt. Ex. 1, 148, 159.) Mr. Arthur knew that the funds used in the transaction represented the proceeds of his fraud: he caused the Runzheimer check in the amount of $43,675 to be deposited into the Xtant Crestar account on or about February 10, 2000 (Govt. Ex. 148), the bankruptcy petition was signed on February 18, 2000 (Govt. Ex. 1), and the instant transaction occurred on or about March 15, 2000. Finally, the circumstances, including Mr. Arthur's use of the third-party Xtant account to make the payment and his holding of the Runzheimer income in that account, demonstrated the Mr. Arthur knew that the transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10, and that the financial transaction was conducted with the intent to promote the ongoing concealment of his assets and income as charged in Counts 1 and 3-10, including Mr. Arthur's work for Runzheimer and his interest in the home at 1085 Saratoga Lane, Lake Geneva. Again, the evidence demonstrated that this transaction was separated from the underlying concealment.

Count 19 pertained to an April 13, 2000 payment of $10,978.30 drawn on the Xtant Crestar account on Mr. Arthur's MBNA credit card. (Govt. Ex. 148, 159; see also Govt. Ex. 156 at 3.) The government proved all of the elements of the offense beyond a reasonable doubt. Mr. Arthur signed the check on the Xtant account and conducted this financial transaction with MBNA. (Govt. Ex.10 #001212.) The transaction again involved the

39

proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which Mr. Arthur failed to disclose on his bankruptcy petitions and schedules. (Govt. Ex. 1, 148, 159.) Mr. Arthur knew that the funds used in the transaction represented the proceeds of his bankruptcy fraud: he caused the Runzheimer check in the amount of $43,675 to be deposited into the Xtant Crestar account on or about February 10, 2000 (Govt. Ex. 148), the bankruptcy petition was signed on February 18, 2000 and filed on March 28, 2000 (Govt. Ex. 1), and the instant transaction occurred on or about April 13, 2000. Finally, the circumstances, including Mr. Arthur's use of the third-party Xtant account to make the payment and his holding of the Runzheimer income in that account, demonstrated the Mr. Arthur knew that the transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10, and that the transaction was conducted with the intent to promote the ongoing concealment of his assets, income and liabilities as charged in Counts 1 and 3-10, including the credit card accounts he failed to disclose on his petition and schedules. These transactions were separated from the underlying concealment/failure to disclose, and given the use of third-party accounts constituted more than mere money spending.

**Count 20** pertained to another payment on the mortgage on defendants' home in Lake Geneva, this one dated July 25, 2000 and drawn on the Xtant Wachovia account in the amount of $4542.48. (Govt. Ex. 149 at 1.) The government proved all of the elements of the offense beyond a reasonable doubt. Mr. Arthur signed the check on the Xtant Wachovia account and conducted this financial transaction with TCNB. (Govt. Ex.11 #001261.) The transaction again involved the proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which he failed to disclose on his bankruptcy

40

petitions and schedules.  (Govt. Ex. 1, 149, 159.)  Mr. Arthur knew that the funds used in the transaction represented the proceeds of his fraud: he caused a Runzheimer check in the amount of $46,250 to be deposited into the Xtant Wachovia account on or about May 11, 2000[19] (Govt. Ex. 149) and the instant transaction occurred on or about July 25, 2000. Finally, the circumstances, including Mr. Arthur's use of the third-party Xtant account to make the payment and his holding of the Runzheimer income in that account, demonstrated the Mr. Arthur knew that the transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10, and that Mr. Arthur engaged in the financial transaction with the intent to promote the ongoing concealment of his assets and income as charged in Counts 1 and 3-10, including his work for Runzheimer and his interest in the home at 1085 Saratoga Lane, Lake Geneva.

**Count 21** pertained to pertained to an August 24, 2000 payment of $4482.96 on Mr. Arthur's MBNA credit card drawn on the Xtant Wachovia (money market) account.  (Govt. Ex. 149 at 2.)  The government proved all of the elements of the offense beyond a reasonable doubt.  Mr. Arthur signed the check on the Xtant account and conducted this financial transaction with MBNA.  (Govt. Ex.11 #001309.)  The transaction again involved the proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which Mr. Arthur failed to disclose on his bankruptcy petitions and schedules.  (Govt. Ex. 1, 148, 159.)  Mr. Arthur knew that the funds used in the transaction represented the proceeds of

---

[19]The funds involved in this transaction were derived mainly from Mr. Arthur's pre-petition Runzheimer income.  See note 12, supra.  In any event, the money laundering counts also reference Count 1, which continued post-petition (until October 2002).

41

his fraud: he caused a Runzheimer check in the amount of $46,250 to be deposited into the Xtant Wachovia checking account on or about May 11, 2000 (Govt. Ex. 149 at 1), virtually all of the funds were transferred to an Xtant money market account at Wachovia on May 31, 2000 (Govt. Ex. 149 at 2), and the instant transaction occurred on or about August 24, 2000.[20]  Finally, the circumstances, including Mr. Arthur's use of the third-party Xtant accounts to make the payment and his holding of the Runzheimer income in that account, demonstrated the Mr. Arthur knew both that transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10, and that Mr. Arthur engaged in the financial transaction with the intent to promote the ongoing concealment of his assets and income as charged in Counts 1 and 3-10, including the credit card accounts he failed to disclose in his petition and schedules.

**Count 22 and 23** pertained to additional payments on the mortgage on defendants' home in Lake Geneva drawn on the Xtant Wachovia account in the amount of $5000 on September 29, 2000 and $4542.48 on December 20, 2000.  (Govt. Ex. 149 at 2.)  The government proved all of the elements of these offenses beyond a reasonable doubt.  Mr. Arthur signed the checks on the Xtant Wachovia account and therefore conducted these financial transaction with TCNB.  (Govt. Ex. 11 #001311 & 001314.)  The transactions again involved the proceeds of the bankruptcy fraud, i.e. the income paid Mr. Arthur by Runzheimer, which he failed to disclose on his bankruptcy petitions and schedules.  (Govt. Ex. 1, 149, 159.)  Mr. Arthur knew that the funds used in the transaction represented the

---

[20]See n. 19, supra.

42

proceeds of his fraud: he caused a Runzheimer check in the amount of $46,250 to be deposited into the Xtant Wachovia account on or about May 11, 2000[21] (Govt. Ex. 149) and the instant transactions occurred on or about September 29, 2000 and December 20, 2000. Finally, the circumstances, including Mr. Arthur's use of the third-party Xtant account to make the payment and his holding of his Runzheimer income in that account, demonstrated the Mr. Arthur knew that the transaction was designed in whole or in part to conceal or disguise the source or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10, and that Mr. Arthur engaged in the financial transaction with the intent to promote the ongoing concealment of his assets and income as charged in Counts 1 and 3-10, including his interest in the home at 1085 Saratoga Lane, Lake Geneva.

### 3.     Counts 24-26 (Both Defendants)

Counts 24-26 charged both defendant with engaging in money laundering contrary to § 1956(a)(1)(A)(i) and (a)(2)(B)(i), and 18 U.S.C. § 2. The elements of these offenses are set forth above.

**Count 24** pertained to the $3350 check from Thompson Consulting dated April 26, 2000, for Mr. Arthur's legal services, which Mrs. Arthur deposited into the Arthur & Arthur bank account on or about May 4, 2000. (Govt. Ex. 160.) As discussed above in relation to Counts 3 ¶ G. and 11, this amount represented an account receivable due Mr. Arthur for work he performed for Thompson prior to the filing of his bankruptcy petition, which should have been disclosed to the bankruptcy trustee.

---

[21]See n. 19, supra.

43

The government proved the elements of this offense beyond a reasonable doubt. First, Mrs. Arthur knowingly conducted a financial transaction in depositing this check into the Arthur & Arthur account. (Govt. Ex. 22; 151 at 1.) The circumstances demonstrated that Mr. Arthur induced or procured the transaction. David Welnetz of Thompson Consulting testified that although Mr. Arthur performed the work for his company, and Mr. Arthur advised Welnetz of an outstanding invoice for work performed over the previous year when they spoke in April 2000, it was Mrs. Arthur who delivered the invoice to Welnetz. Second, the property involved in the transaction in fact involved the proceeds of the offenses charged in Counts 1 and 3-10, to wit the account receivable from Thompson Consulting which Mr. Arthur omitted from his bankruptcy petition and schedules. Third, the circumstances demonstrated that defendants knew that the property involved in the financial transaction represented the proceeds of unlawful activity. Mr. Arthur had at the time recently filed his bankruptcy petition and knew that he had failed to list all of his assets, including this account receivable. Further, the evidence showed that Mrs. Arthur was also aware of the bankruptcy. She had (apparently with Mr. Arthur's input) prepared a letter to Mr. Arthur dated March 15, 2000 detailing his debts to her. (Govt. Ex. 51.) She was also aware that the amount received from Thompson was for work Mr. Arthur had performed, as she had not performed legal work for Thompson. Finally, defendants engaged in the financial transaction with the intent to promote the carrying on of the offenses charged in Counts 1 and 3-10, and to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10. By placing this payment, which should have been disclosed and potentially included the bankruptcy estate, in the Arthur & Arthur account, defendants promoted the

44

ongoing concealment of assets. Further, Mrs. Arthur used these funds to make a payment on Mr. Arthur's personal credit card with Citibank on May 1, 2000 (Govt. Ex. 151 at 1), furthering the scheme of hiding defendant's assets by engaging in third party transactions.

**Count 25** pertained to the purchase of the SEA DOO with a check for $9502.49 drawn on the Xtant Wachovia account. (Govt. Ex. 19-21; Govt. Ex. 149 at 2.) As discussed in connection with Counts 1 and 12 above, this purchase was funded by Mr. Arthur's pre-petition earnings from Runzheimer, which he failed to disclose in the bankruptcy proceeding and instead placed in the Xtant accounts.

The government proved the elements of this offense beyond a reasonable doubt. First, defendants knowingly conducted this financial transaction with Rob's Performance Motorsports, which involved the transfer of title of a vessel. Second, the property involved in the transaction in fact involved the proceeds of the offenses charged in Counts 1 and 3-10, i.e. Mr. Arthur's income from Runzheimer, which he omitted from his bankruptcy petition and schedules and failed to disclose during the § 341 meetings. Third, the circumstances demonstrated that defendants knew that the property involved in the financial transaction represented the proceeds of unlawful activity. Finally, defendants engaged in the financial transaction with the intent to promote the carrying on of the offenses charged in Counts 1 and 3-10, and to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10. By using a third-party account and titling the water-craft in the name of Xtant, defendants promoted the ongoing concealment of assets and their use of such assets for personal purposes. Xtant, if a legitimate recycled paper-seller, had no use for a personal water-craft.

45

**Count 26** pertained to Mrs. Arthur's deposit of Mr. Arthur's $27,954 payout from Godfrey & Kahn Investment # 6. As discussed in connection with Counts 3 ¶ F and 14 above, Mr. Arthur failed to disclose this pre-petition asset on his petition and schedules.

The government proved the elements of this offense beyond a reasonable doubt. First, Mrs. Arthur knowingly conducted this financial transaction in depositing this check into her M & I bank account. (Govt. Ex. 26, 123.) The evidence showed that Mr. Arthur initially sought to have Godfrey & Kahn make the check payable to Mrs. Arthur, but Bernstein refused. Defendants then "lost" the first two checks sent before Mr. Arthur finally signed the third check over the Mrs. Arthur in March 2001, six months after it was issued. Thus, the circumstances demonstrated that Mr. Arthur induced, aided or procured the transaction. Second, the property involved in the transaction in fact involved the proceeds of the offenses charged in Counts 1 and 3-10, i.e. investment proceeds which Mr. Arthur omitted from his bankruptcy petition and schedules. Third, the circumstances demonstrated that defendants knew that the property involved in the financial transaction represented the proceeds of unlawful activity. Finally, defendants engaged in the financial transaction with the intent to promote the carrying on of the offenses charged in Counts 1 and 3-10, and to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity charged in Counts 1 and 3-10. By placing this payment, which should have been disclosed and potentially included the bankruptcy estate, into Mrs. Arthur's account, defendants promoted the ongoing concealment of assets and also attempted to demonstrate, after the fact, that they were complying with the MPA's.

46

## II. VERDICT

On count 1, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 2, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 3, the court finds the defendant Ronald Arthur guilty.

On count 4, the court finds the defendant Ronald Arthur guilty.

On count 5, the court finds the defendant Ronald Arthur guilty.

On count 6, the court finds the defendant Ronald Arthur guilty.

On count 7, the court finds the defendant Ronald Arthur guilty.

On count 8, the court finds the defendant Ronald Arthur guilty.

On count 9, the court finds the defendant Ronald Arthur guilty.

On count 10, the court finds the defendant Ronald Arthur not guilty.

On count 11, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 12, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 13, the court finds the defendant Ronald Arthur not guilty, and the defendant Mary Arthur not guilty.

On count 14, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 15, the court finds the defendant Ronald Arthur not guilty, and the defendant Mary Arthur not guilty.

47

On count 16, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 17, the court finds the defendant Ronald Arthur guilty.

On count 18, the court finds the defendant Ronald Arthur guilty.

On count 19, the court finds the defendant Ronald Arthur guilty.

On count 20, the court finds the defendant Ronald Arthur guilty.

On count 21, the court finds the defendant Ronald Arthur guilty.

On count 22, the court finds the defendant Ronald Arthur guilty.

On count 23, the court finds the defendant Ronald Arthur guilty.

On count 24, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 25, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

On count 26, the court finds the defendant Ronald Arthur guilty, and the defendant Mary Arthur guilty.

**SO ORDERED.**

Dated at Milwaukee, Wisconsin, this 7th day of November, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge