# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

    v.                                                                             Case No. 04-CR-122

**RONALD A. ARTHUR and MARY K. ARTHUR**
        **Defendants.**

## DECISION AND ORDER

The government charged defendants Ronald and Mary Arthur with bankruptcy fraud and money laundering offenses in a twenty-six count indictment. Following a trial to the court, I found Mr. Arthur guilty of twenty-three of twenty-six counts, and Mrs. Arthur guilty of nine of the eleven counts in which she was charged. The government now moves for a preliminary order of forfeiture of assets listed in the indictment, including defendants' Lake Geneva condominium, a Honda Civic and a SEA DOO personal water craft. Because defendants apparently disposed of the Civic and the SEA DOO (Ronald Arthur Mem. in Opp'n to Govt.'s Mot. [R. 109] at 1), the government seeks a money judgment of equal value, as well as a personal money judgment in an amount equal to the total of the laundered funds.

### I. FORFEITURE STANDARD

In imposing sentence on a person convicted of money laundering, the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1).

Section 982(b)(1) directs the court to use the forfeiture procedures set forth in § 413 of the Controlled Substances Act, 21 U.S.C. § 853.

Forfeiture is considered part of the defendant's sentence rather than an element of the underlying crime. United States v. Patel, 131 F.3d 1195, 1200 (7th Cir. 1997). Therefore, the court uses the preponderance of the evidence standard rather than beyond a reasonable doubt. Id. Blakely and Booker do not apply to forfeiture determinations. United States v. Tedder, 403 F.3d 836, 841 (7th Cir.), cert. denied, 126 S. Ct. (2005).

Following a guilty verdict, the court must determine whether the requisite nexus exists between the offense and the specific property identified in the indictment to justify forfeiture. If the government seeks a personal money judgment, the court must determine the amount. The court may base its determination on the evidence of record or hold a post-verdict hearing. Fed. R. Crim. P. 32.2(b)(1). If the court determines that property is subject to forfeiture, it must enter a preliminary order of forfeiture setting forth the amount of any money judgment or directing the forfeiture of specific property. Determination of the interests of the defendants and any third parties in the property is deferred until the ancillary proceedings under Rule 32.2(c). Fed. R. Crim. P. 32.2(b)(2); Charles A. Wright et al., Federal Practice and Procedure § 544, at 441-42 (2004).[1]

## II. FACTS AND BACKGROUND

I found defendants jointly guilty of conspiracy to commit money laundering (count two) and three substantive money laundering counts (counts 24-26), and Mr. Arthur alone

---

[1] Rule 32.2(b)(4) allows the defendant to have the jury determine whether the government has established the requisite nexus. In the present case, defendants waived a jury.

2

guilty of seven substantive money laundering counts (counts 17-23).[2] In a nutshell, this case involved defendants' concealment, in a Chapter 7 proceeding, of Mr. Arthur's considerable assets and income from the bankruptcy trustee and his creditors. As part of the fraud, defendants set up and used dummy corporations, such as Xtant Foundation, Inc., to hold Mr. Arthur's income. The money laundering counts arose out of the concealment of Mr. Arthur's income and subsequent financial transactions designed to hide the source of the funds and promote the ongoing concealment. I discuss below the specific transactions related to the forfeiture motion and the assets at issue.[3]

**A.    Honda Civic**

Count seventeen pertained to Mr. Arthur's February 25, 2000 purchase of a 1998 Honda Civic using funds that he failed to disclose on his bankruptcy petition and schedules. Specifically, Mr. Arthur paid $12,558.82 for the car with a check drawn on the Xtant Foundation Crestar bank account. This account was funded by a $43,675 check from Rex Runzheimer as compensation for Mr. Arthur's pre-petition services. (Findings of Fact and Verdict [R. 76] at 37-38; 7.)

**B.    SEA DOO**

Count twenty-five pertained to defendants' June 9, 2000 purchase of a SEA DOO personal water-craft with a check for $9502.49 drawn on the Xtant Foundation's Wachovia

---

[2]Additionally, I found defendants guilty of conspiracy to commit bankruptcy fraud, (count 1), unlawfully receiving debtor property (counts 11, 12 & 14) and making a false claim in the bankruptcy proceeding (count 16), and Mr. Arthur guilty of making false oaths or accounts during the bankruptcy proceeding (counts 3-9). The bankruptcy counts are not directly relevant to the forfeiture issue.

[3]A more detailed recitation of events is contained in my written Findings of Fact and Verdict, Docket # 76.

3

bank account. This purchase was also funded by Mr. Arthur's pre-petition earnings from Runzheimer, which he failed to disclose. (Id. at 45; 9-10.)

**C.     Lake Geneva Home**

Count eighteen pertained to a March 15, 2000, mortgage payment of $4484.40 to Tri City National Bank ("TCNB"), drawn on the Xtant Crestar bank account, on defendants' Lake Geneva home. Again, the source of the funds in the account was Mr. Arthur's undisclosed Runzheimer income. (Id. at 38-39; 7-8.) Similarly, count twenty concerned a July 25, 2000 mortgage payment of $4542.48 on the Lake Geneva home with proceeds of the bankruptcy fraud, i.e. income Runzheimer paid to Mr. Arthur, which Arthur failed to disclose. (Id. at 40-42.) Finally, counts twenty-two and twenty-three pertained to additional mortgage payments – $5000 on September 29, 2000 and $4542.48 on December 20, 2000. These transactions again involved the proceeds of the bankruptcy fraud, i.e. the income paid to Mr. Arthur by Runzheimer, which Arthur failed to disclose on his bankruptcy petitions and schedules. (Id. at 42-43.)

As noted, the government sought forfeiture of the Civic, the SEA DOO and the Lake Geneva condominium. It amended its request to include a money judgment upon discovery of defendants' apparent disposal of the Civic and the SEA DOO. The government also seeks a personal money judgment against defendants in an amount equal to the funds laundered. Defendants oppose forfeiture.

### III.  DISCUSSION

Before turning to the specific items at issue, I address defendants' general arguments against forfeiture.

4

### A. Mr. Arthur's Position

Mr. Arthur's opposition to the forfeiture motion reads like an appellate brief attacking the sufficiency of the evidence. He claims that the money laundering convictions all share the same "fatal flaw – they fail to link the specific financial transactions to an identifiable pool of 'dirty money' that existed prior to the putative 'laundering' transaction." (Ronald Arthur's Mem. in Opp'n to Govt.'s Mot. at 2.) This is the wrong place and time for such arguments. In any event, the arguments lack merit.

#### 1. The Evidence of Money Laundering was Sufficient

The money laundering counts involved pre-petition income and funds, which should have been disclosed in the bankruptcy petition and potentially made a part of the bankruptcy estate. (Findings of Fact and Verdict at 41 n.19; 43 n.21.) As for Mr. Arthur's claim that he could not launder funds prior to the filing of his bankruptcy petition, I specifically found that the transactions at issue occurred after he signed the petition (Id. at 37), and "there is no requirement that the entire fraudulent scheme be complete before the defendant starts laundering the proceeds from early portions of the scheme." United States v. Seward, 272 F.3d 831, 837 (7th Cir. 2001).[4] The evidence showed that

---

[4]Mr. Arthur admits that, ordinarily, the underlying crime need not be completed before the proceeds can be laundered. However, he contends that this rule does not apply in bankruptcy fraud cases. (Ronald Arthur's Mem. in Opp'n to Govt. Mot. at 9-11.) He seems to base his position on the fact that there is only one discharge in a bankruptcy case and usually only one "turn-over" order. He cites no authority in support of his argument. In fact, United States v. Dennis, 237 F.3d 1295 (11th Cir. 2001), which Mr. Arthur cites elsewhere in his brief, suggests the opposite. In that case, the court affirmed a money laundering conviction based on the defendant's financial transactions with funds he failed to disclose "and thus kept . . . beyond the reach of the bankruptcy court." Id. at 1302. The court further noted that, after the bankruptcy case was filed, the defendant directed additional transfers from a bank account he had previously failed to disclose to the trustee. Id. The court found that by failing to disclose property and acting to prevent later

5

defendants' concealment was ongoing and continued after the petition was filed, and included concealment of additional income and assets received post-petition, which, while perhaps not part of the bankruptcy estate, served to perpetuate the earlier fraud and prevent its discovery. The money laundering conspiracy continued from February 2000, when the bankruptcy petition was signed, until October 2002.

Mr. Arthur contends that the government failed to show that defendants "disguised" their relationship to the various assets at issue. Specifically, he notes the paper trail from defendants to Xtant. The fact that defendants perhaps could have been more sophisticated in concealing their activities does not mean that there was no concealment. Defendants deposited ill-gotten funds into the bank accounts of dummy corporations; they used third parties such as Halco Financial and Realty Corp., Xtant Foundation and Greystone Communications to conceal Mr. Arthur's assets; and they engaged in unusual financial moves, such as submitting invoices to Runzheimer in the name of "Arthur and Arthur" but asking that payments be made to Xtant "as an accommodation" (and later having payments directed to Greystone). Such maneuvers are all indicative of a design to conceal. United States v. Turner, 400 F.3d 491, 497 (7th Cir. 2005).

---

disclosure, the defendant deceived the bankruptcy court, the estate's creditors, and the custodian. "This resulted in financial loss to the estate and financial gain to Dennis." Id. The court concluded: "The property itemized in the indictment came from an unlawful source because it emanated from a bankruptcy fraud. There was sufficient evidence from which a reasonable jury could conclude that Dennis was guilty of the money laundering offenses beyond a reasonable doubt." Id. at 1303 (internal citation and quote marks omitted). In sum, the court found that the funds "emanated from a bankruptcy fraud" because they were concealed, not because the defendant violated some order of the bankruptcy court in failing to turn them over or because he received a discharge. The Dennis decision also demonstrates that a "pool" of money is created when such funds are not disclosed on the debtor's petition and schedules.

6

Mr. Arthur claims that proof as to the Lake Geneva condominium is lacking because, although he used Xtant Foundation checks to pay the mortgage, he never concealed his relationship to the house he occupied. I disagree. Mr. Arthur (assisted by Mrs. Arthur) went to some lengths to claim that he lived in Virginia. (Findings of Fact and Verdict at 12-14.) Further, he concealed this asset – his home – from the bankruptcy court, which was the material issue.

Mr. Arthur also makes the odd argument that "the very personal nature of the expenses – home, auto and personal watercraft" – belies the argument that these were "commercial transactions" designed to disguise the fact that these assets were connected to him. (Ronald Arthur Mem. in Opp'n to Govt.'s Mot. at 13.) Similarly, in his sur-reply, Mr. Arthur claims that the Civic and the SEA DOO were simply accouterments of defendants' everyday living activities. (Ronald Arthur Am. Sur-Reply [R. 120] at 4.) However, defendants' position at trial was that the Civic was purchased to haul paper for Xtant[5] (see Findings of Fact and Verdict at 7) and that all of the Xtant expenditures were approved by its "directors" – Edward Sadler, Susan Svoboda and Mrs. Arthur – rather than being controlled by Mr. Arthur (id. at 3, 9). Mr. Arthur also ignores the fact that these assets were not just the family car and recreation vehicle; they were purchased with dirty money and were the subject of two specific money laundering counts on which he was convicted.

In his sur-reply, Mr. Arthur mounts a somewhat different attack on his conviction (but again under his version of the facts), characterizing the money laundering as "Mrs. Arthur

---

[5]Xtant Foundation's supposed business was selling recycled paper. However, the evidence showed that Xtant did no business and existed to hold Mr. Arthur's concealed income. (Findings of Fact and Verdict at 3.)

7

making deposits of her individual property into 'sham' corporations, and then authorizing her husband to sign checks written against those accounts to pay the personal expenses of Mrs. Arthur and her family." (Ronald Arthur Am. Sur-Reply at 3.) He ignores my findings that the income at issue was his, and that he issued checks using that income without the approval of Mrs. Arthur or any other supposed director of Xtant Foundation. (Findings of Fact and Verdict at 3-4.)

Finally, Mr. Arthur cites United States v. McIntosh, 124 F.3d 1330 (10th Cir. 1997), but that case is easily distinguishable. The McIntosh court reversed the defendant's money laundering convictions because they involved post-petition funds, which the government did not argue was the property of the bankruptcy estate and which the defendant had no duty to report. Id. at 1336. In the present case, as I was careful to note, the money laundering transactions involved pre-petition income, which Mr. Arthur had a duty to report. (Findings of Fact and Verdict at 41 n.19.)[6]

### 2. The Bankruptcy Court Made No Relevant Findings

Mr. Arthur also claims that the verdict is contrary to the findings of the bankruptcy court, but his contentions are off base. After allegations of fraud arose, Mr. Arthur waived

---

[6]In McIntosh, the court also reversed a bankruptcy fraud count based on the defendant's failure to disclose an interest in the home in which he lived, which was owned by his father. The court found that the government offered no evidence establishing that the defendant had a legal or equitable interest in the property. Id. at 1335. In the present case, the government proved that Mr. Arthur had an equitable interest in the Lake Geneva home. The home was initially titled in the name of Halco, another corporation Mr. Arthur controlled, and was later transferred to Mrs. Arthur pursuant to a sham marital property agreement. Yet he continued to live there and made payments on the home. (Findings of Fact and Verdict at 14.) Mr. Arthur quibbles with my use of the term "beneficial interest" (id. at 14) rather than "equitable interest," but this is a distinction without a difference. In any event, no count of conviction was based solely on the failure to disclose this property. Rather, it was listed as just one of many such failures in count three. (Id. at 12-19.)

8

his right to discharge, and the trustee elected to settle the case for $25,000. Neither the bankruptcy court nor the trustee found that the martial property agreements were valid. Nor did the court make a finding on the size of the estate; it simply accepted the trustee's proposed $25,000 settlement, given the "uncertainty [of] finding hidden assets." (Ronald Arthur's Mem. in Opp'n to Govt.'s Mot. Ex. 3 at 21.) Thus, there is no conflict between the verdict in the present case and the judgment of the bankruptcy court because that court made no findings on the relevant issues.

In sum, the verdict in this case is not based on "magically reaching" back and transforming all of the Arthurs pre-petition income into "proceeds" of the completed crime of bankruptcy fraud. Rather, it was based on specific financial transactions involving specific funds that Mr. Arthur intentionally concealed in his bankruptcy filings. (Findings of Fact and Verdict at 34-46.) Further, these transactions were separate and distinct from the underlying fraud. (Id. at 35, 38, 39, 40.) Finally, unlike in McIntosh, Mr. Arthur did violate a duty to disclose the funds involved in these transactions. (Id. at 41 n.19.) Therefore, I reject Mr. Arthur's contention that forfeiture is improper because he did not engage in money laundering.

**B.     Mrs. Arthur's Position**

In her response, Mrs. Arthur argues that the government's motion, filed six months after the verdict, was not made "[a]s soon as practicable," as Rule 32.2(b)(1) requires. However, the parties specifically agreed to delay addressing forfeiture after the verdict was announced on November 7, 2005. (Govt.'s Reply Br. Ex. A at 7.) Further, Mrs. Arthur fails to explain how any delay prejudiced her.

9

Mrs. Arthur also claims that the motion is not specific and fails to set forth the government's theory of forfeiture. However, the government's motion specifically identified three assets, which were listed in the indictment and discussed at length at trial. Further, defendants have been given a full opportunity to respond to the government's contentions via an unlimited sur-reply brief. (July 7, 2006 Margin Order [R. 116].)

Finally, Mrs. Arthur argues that the proper standard of proof is beyond a reasonable doubt. Tedder, 403 F.3d at 841 and United States v. Swanson, 394 F.3d 520, 526 (7th Cir. 2005) suggest otherwise, but the result in this case would be the same. All factual findings I make herein are supported by evidence beyond a reasonable doubt. See generally Jones v. United States, 526 U.S. 227, 239-40 (1999) (noting that the court should avoid constitutional questions when possible).

I turn now to the specific forfeiture issues.

**C.     Analysis of Items Sought to be Forfeited**

    **1.     The Civic and the SEA DOO**

The Civic and the SEA DOO were both purchased with funds illegally concealed in Xtant bank accounts, which were therefore unavailable to the bankruptcy estate. The funds in these accounts came from fees Runzheimer paid to Mr. Arthur for Arthur's pre-petition work. Both pieces of property were "involved in" the money laundering offenses charged in counts seventeen and twenty-five. The financial transactions constituting money laundering in those counts involved the transfer of the title to the Civic (Findings of Fact and Verdict at 38) and the SEA DOO (id. at 45). These assets are also directly

10

"traceable to" the funds involved in the laundering transactions, as both were purchased with dirty money. Therefore, both assets are forfeitable.

However, both assets have, according to Mr. Arthur, been disposed of since the indictment was handed up. In the indictment, the government gave notice that it may seek a money judgment and/or elect to proceed against substitute property if the subject property has been transferred. Given the disposal of these assets, the government is entitled to a personal money judgment against Ronald Arthur in the amount of $22,061.31 (the value of the Civic and SEA DOO at the time of purchase) and $9502.40 against Mary Arthur (the value of the SEA DOO alone, as she was not convicted on count seventeen). See United States v. Huggins, 376 F. Supp. 2d 580, 585 (D. De. 2005) ("The government is entitled to a personal money judgment against a defendant for an amount equal to the value of the property that was involved in the money laundering violation."). These amounts are joint and several. See United States v. Genova, 333 F.3d 750, 761 (7th Cir. 2003).

### 2    The Lake Geneva Condominium

I cannot conclude that the Lake Geneva condominium is subject to forfeiture. Mr. Arthur conducted four financial transactions regarding this home: (1) on March 15, 2000 he made a $4484.40 mortgage payment from the Xtant Crestar account (count 18); (2) on July 25, 2000, he made a $4542.48 mortgage payment from the Xtant Wachovia account (count 20); (3) on September 29, 2000, he made a $5000 mortgage payment from the

Xtant Wachovia account (count 22); and (4) on December 29, 2000, he made a $4524.48 mortgage payment from the Xtant Wachovia account (count 23).[7]

The Lake Geneva property was not "involved in" the money laundering offenses; nor is such property traceable to the property involved in those offenses. Defendants made payments on the property with dirty money, as they did on various other debts. But the property was not the subject of the money laundering conspiracy, nor was it acquired with dirty money. The financial transactions at issue occurred when Mr. Arthur submitted funds to TCNB, a financial institution; title to the Lake Geneva property did not change hands at any relevant time.[8] Further, the equity defendants possess in the property is not traceable to the corpus of the money laundering offense. Therefore, the property is not forfeitable. See United States v. Lee, 232 F.3d 556, 560-61 (7th Cir. 2000).

The government's argument that the Lake Geneva condominium was "facilitating" property is unpersuasive. The government cites United States v. Baker, 227 F.3d 955, 970

---

[7] Mr. Arthur also made a $2976.52 mortgage payment using Runzheimer earnings on December 29, 1999, and on January 31, 2000 made $3027.03 and $2635.49 property tax payments. (Findings of Fact and Verdict at 23-24.) These transactions were relevant to the bankruptcy fraud charges, because Mr. Arthur lied about having made such payments. However, they are not directly relevant to the money laundering charges or the forfeiture issue.

[8] The money laundering statute defines the term "financial transaction" as "(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4). The counts involving the Civic and the SEA DOO involved the transfer of title under sub-section (A)(iii). (Findings of Fact and Verdict at 38, 45.) The counts involving the mortgage on the Lake Geneva home involved transactions with financial institutions under sub-section (B). (Id. at 39.)

12

n.3 (7th Cir. 2000), where the court forfeited real property, but in that case the property was the locus of the defendant's illegal prostitution business, called "Fantasyland." In the present case, there is no evidence that the Lake Geneva property facilitated the crime; it was simply where defendants lived. There is no evidence that the Lake Geneva condominium facilitated the crime any more than any other residence, and it cannot be the law that a money launderer's home is always forfeitable.

In <u>Genova</u>, 333 F.3d at 762-63, the court discussed the possible forfeiture of a house improved with dirty money.[9] In that case, the defendant, a corrupt mayor, had used city employees to perform work on his house and may have used dirty money to buy building materials. The court stated:

> We may assume that the defendant has the burden of raising a contention that a given asset contains a mixture of forfeitable proceeds and nonforfeitable contributions from lawful sources; likewise we may assume that the defendant bears at least some burden of production with respect to this contention. . . . But once the defendant has contended, with some evidentiary support, that at least some of the value in a given asset came from lawful, nonforfeitable sources, then the prosecutor must demonstrate how much is forfeitable. The United States and the district court must have agreed with this position, because the prosecutor did not contend (nor did the district judge find) that the entire value of Genova's house is forfeitable; the sentence directs him to forfeit only the $60,000 value of the improvements. But just as the house as a whole contains nonforfeitable value, so the improvements made during his mayoralty may contain nonforfeitable value. The district judge must try to determine which is which.

<u>Id.</u> at 763.

In the present case, the government seeks forfeiture of the entire property, despite the fact that the unlawful payments made on it can be specifically traced. Mr. Arthur has

---

[9]<u>Genova</u> was a RICO case, but the forfeiture provision of that statute is comparable to § 982.

13

submitted specific evidence demonstrating the amount of laundered funds paid towards the house.[10] (Ronald Arthur Mem. in Opp'n to Govt.'s Mot. Ex. 4.) The government contends that the amount is somewhat greater. (Govt.'s Reply Br. at 7-8; Trial Ex. 158, 18B.) However, according to both sides, defendants have equity in the property, which was initially purchased in 1993 and completed in 1997, aside from that reflected in the deposits traceable to money laundering. It is therefore improper to forfeit the house. I discuss below the specific amount forfeitable in relation to these payments.

### 3. Money Judgment

The government advised in ¶ 45(b) of the indictment that it intended to seek a personal money judgment for the amount involved in the money laundering offenses. A criminal forfeiture order may take the form of an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense. Baker, 227 F.3d at 970 (citing United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999)). The government contends that it is entitled to judgment in the amount of $366,592, the amount involved in the entire money laundering conspiracy. (Trlal Ex. 157.) In the alternative, the government seeks $87,395.23, the amount involved in the substantive money laundering counts (of which $22,061.31 is attributable to the Civic and SEA DOO). I agree that the government is entitled to the latter amount.

In setting the forfeiture, I must determine the amount of the "proceeds" involved in the money laundering offenses. See Genova, 333 F.3d at 761; Baker, 227 F.3d at 967-68.

---

[10]Specifically, Mr. Arthur states that most of the $14,084.96 paid towards the mortgage went towards interest, with only about $1472 to principal, a de minimus amount compared to the equity in the property. (Ronald Arthur Mem. in Opp'n. to Govt.'s Mot. at 19.)

14

Forfeiture is gain-based, unlike restitution, which is loss-based. Thus, I must determine the proceeds of defendants' crimes, "which means profits net of the costs of the criminal business." Genova, 333 F.3d at 761; see also Santos v. United States, 461 F.3d 886 (7th Cir. 2006) (re-affirming Seventh Circuit's position on net v. gross income under § 1956).

Under the particular circumstances of the present case, the proceeds involved equal $87,395.93.[11] This is the amount laundered in counts 17-26, which involved pre-petition income that defendants concealed from the bankruptcy court, trustee and creditors. (Findings of Fact and Verdict at 29 n.12; 41 n.19.)

Counts 17, 18 and 19 involved pre-petition income received prior to the signing and filing of the bankruptcy petition. Specifically, the financial transactions in these counts were made using $43,675 from Runzheimer deposited into an Xtant Crestar account on February 10, 2000. (Findings of Fact and Verdict at 38.) This amount could have been made part of the estate, had it not been concealed in the account of a dummy corporation. Counts 20, 21, 22, 23 and 25 involved funds drawn on an Xtant Wachovia account. The Wachovia account was funded by $32,298.01 pulled out of the Crestar account, supplemented by $46,250 in Runzheimer income, on May 11, 2000. The latter payment from Runzheimer represented compensation for Mr. Arthur's services from January to April 2000 (mostly prior to the March 28, 2000 filing of the bankruptcy petition). (Id. at 29 n.12.)

---

[11]There appears to be a mathematical error in the government's figure. By my calculation, the change is .93 not .23. I arrive at the total by adding $12,558.82 (Honda Civic, count 17) + $4484.40 (TCNB mortgage, count 18) + $10,979.30 (MBNA credit card, count 19) + $4542.48 (TCNB mortgage, count 20) + $4482.96 (MBNA credit card, count 21) + $5000 (TCNB mortgage, count 22) + $4542.48 (TCNB mortgage, count 23) + $3350 (Thompson legal fee, count 24) + $9502.49 (SEA DOO, count 25) + $27,954 (Godfrey and Kahn Investment #6, count 26) = $87,395.93.

15

Thus, although some of the funds contained in the Wachovia account were received post-petition, such funds were co-mingled with the earlier, pre-petition income. Further, the amount involved in counts 20-23 and 25 ($28,070.41) is less than $32,298.01, the remainder of the pre-petition income transferred into the Wachovia account. To the extent that good money cannot be definitively separated from bad in this one account, "[a]s the wrongdoer, [Mr. Arthur] bears the risk of uncertainty." Genova, 333 F.3d at 763.

Count 24 involved a legal fee received from Thompson Consulting on April 26, 2000, after the filing of the petition. However, this represented an account receivable due prior to filing, which should have been disclosed. (Id. at 43; 16.) Similarly, count 26 involved the proceeds from Godfrey & Kahn Investment #6, a pre-petition asset that should have been disclosed and potentially made part of the estate. (Id. at 46.)

I decline to order forfeiture of the greater amount sought by the government, $366,592. It is true that forfeiture is not necessarily limited to the amount involved in the specific money laundering transactions charged. Baker, 227 F.3d at 969. Funds involved in a conspiracy to launder money may be forfeitable, as is clean money co-mingled with dirty. Baker, 227 F.3d at 970. However, under the circumstances of this case, I decline to order forfeiture of all of Mr. Arthur's post-petition income and assets just because some of it was mingled in bank accounts with pre-petition funds. The post-petition income did not, as in Baker, 227 F.3d at 970 n.4, specifically fund continuation of the scheme. While it is true that the ongoing concealment of Mr. Arthur's Runzheimer income was essential to the success of the conspiracy to hide assets,[12] such post-petition income is not, itself,

---

[12] If the trustee had learned of such income it would have been easier for her to also discover Mr. Arthur's concealed pre-petition Runzheimer income, and the scheme would

an ill-gotten gain. Mr. Arthur could have kept that money had he previously been honest about his employment, income and assets. See 11 U.S.C. § 541(a)(6) (excluding from the estate "earnings from services performed by an individual debtor after the commencement of the case"); In re Prince, 85 F.3d 314, 322 (7th Cir. 1996) ("Although the Bankruptcy Code casts a broad net over the assets of the debtor, pulling virtually all the debtor's property interests into the bankruptcy estate, the Code expressly excludes 'earnings from services performed by an individual debtor after the commencement of the case.'"); Young v. Key Bank (In re Young), 66 F.3d 376, 377 (1st Cir. 1995) (stating that, unlike chapter 13, income earned during the pendency of a chapter 7 case does not become part of the state). Thus, it does not constitute "proceeds" for purposes of forfeiture.

Therefore, the government will receive a personal money judgment against Ronald Arthur in the amount of $87,395.93 and Mary K. Arthur in the amount of $40,806.49.[13] These amounts are due joint and several. See Genova, 333 F.3d at 761.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the government's motion (R. 101) is **GRANTED** in part as stated herein.

---

have crumbled. As I noted in my Findings of Fact and Verdict, because the underlying crime involved concealment, the money laundering fell under both the "promotion" and "concealment" prongs of § 1956. (Findings of Fact and Verdict at 35-36.)

[13]Mr. Arthur argues that the forfeiture cannot be larger than $25,000, which he contends is the size of the bankruptcy estate. His argument lacks merit. As noted, the bankruptcy court did not determine the size of the estate; rather, it accepted a $25,000 settlement given the difficulty of finding hidden assets. In this case, the government demonstrated the extent of those hidden assets. The parties do not address whether Mr. Arthur is entitled to an offset for the $25,000 paid to settle the bankruptcy case. It could perhaps be argued that this amount constituted "costs of the criminal business." Genova, 333 F.3d at 761.

**IT IS FURTHER ORDERED** that the United States be awarded a personal money judgment against Ronald A. Arthur in the amount of $87,395.93 and against Mary K. Arthur in the amount of $40,806.49.

**FINALLY, IT IS ORDERED** that this Order be incorporated by reference in the Judgment and Commitment Orders.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge