# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
       **Plaintiff,**

   **v.**                                **Case No. 04-CR-122**

**MARY KATHLEEN ARTHUR**
       **Defendant.**

---

## SENTENCING MEMORANDUM

Ronald Arthur, upset about a default judgment a woman named Barbara Doyle had obtained against him, decided to utilize the bankruptcy system in a misguided attempt to discharge the judgment and foil others with whom he was involved in contentious litigation. Mr. Arthur, a lawyer, solicited the assistance of his wife, defendant Mary Kathleen Arthur (hereafter "defendant" or "Mrs. Arthur"), also an attorney, in concealing his assets and inflating his liabilities. For instance, he purported to transfer virtually all of his income and assets to defendant pursuant to several phony marital property agreements, and created fictitious entities such as the "Xtant Foundation" and "Greystone Communications" to hold his considerable earnings as a real estate consultant to Rex Runzheimer, a developer. He installed defendant and his sister, Susan Svododa, as "directors" of Xtant, although Xtant did no business and served no purpose other than holding his money. Mr. Arthur also solicited defendant to file a phony claim against him in the bankruptcy proceeding, seeking payment for $650,000 in legal fees for services she supposedly rendered to him. At Mr. Arthur's prodding, defendant also filed a motion to quash a subpoena served on Runzheimer by a creditor in an attempt to prevent the discovery of Mr. Arthur's

considerable earnings.

The bankruptcy trustee became suspicious and filed an adversary action against Mr. Arthur. Mr. Arthur eventually agreed to waive discharge and settled the trustee's action for $25,000. However, that did not end the matter, as the government later obtained an indictment against the Arthurs charging bankruptcy fraud and money laundering conspiracies, as well as various substantive fraud and money laundering offenses.[1]

The Arthurs waived a jury and proceeded to trial before the court. Defendant and Svoboda testified in support of Mr. Arthur's position, but I rejected their testimony as incredible and found Mr. Arthur guilty of twenty-three of twenty-six counts and Mrs. Arthur guilty of nine of the eleven counts in which she was charged.

The probation office prepared a pre-sentence report ("PSR"), setting defendant's offense level on the bankruptcy fraud group[2] at 24 (base level 6, U.S.S.G. § 2B1.1(a), plus 10 based on loss amount, § 2B1.1(b)(1)(F), plus 2 based on misrepresentation in a bankruptcy proceeding, § 2B1.1(b)(8)(B), plus 2 for use of sophisticated means, § 2B1.1(b)(9)(C), plus 2 for use of a special skill, § 3B1.3, and plus 2 for obstruction of justice, § 3C1.1). On the money laundering group,[3] the PSR set an offense level of 30 (base level 24, U.S.S.G. § 2S1.1(a)(1), plus 2 based on defendant's conviction under 18 U.S.C. § 1956, § 2S1.1(b)(2)(B), plus 2 for sophisticated laundering, § 2S1.1(b)(3)(B), and

---

[1]The money laundering offenses arose out of financial transactions in which the Arthurs engaged using the concealed income, including the purchase of a Honda Civic and a SEA DOO personal water-craft.

[2]The PSR grouped the bankruptcy fraud offenses together under U.S.S.G. § 3D1.2(b).

[3]The PSR again grouped these offenses under § 3D1.2(b).

2

plus 2 for obstruction of justice, § 3C1.1). The PSR set the final offense level at 30 under U.S.S.G. § 3D1.2(c) and, coupled with defendant's criminal history category of I, recommended an imprisonment range of 97-121 months.

Defendant objected to various portions of the PSR, moved for departure on several grounds, and requested a non-guideline sentence of probation under 18 U.S.C. § 3553(a). The government opposed defendant's departure requests and advocated a sentence at the low end of the applicable guideline range. In this memorandum, I set forth my resolution of the guideline issues and provide the reasons for the sentence imposed.

## I. SENTENCING PROCEDURE

I follow a three-step sentencing procedure in light of United States v. Booker, 543 U.S. 220 (2005). First, I determine the advisory guideline range, resolving any disputes necessary to that determination. Second, I decide whether to grant any departures pursuant to the Sentencing Commission's policy statements. Finally, I select a sentence that is sufficient but not greater than necessary given all of the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Peralta-Espinoza, 413 F. Supp. 2d 972, 974 (E.D. Wis. 2006).

## II. DISCUSSION

## A.    Guideline Determinations

Prior to taking up defendant's written objections, I made two preliminary findings, consistent with findings I previously made in Mr. Arthur's case. First, under application note 2(C) to U.S.S.G. § 2S1.1, chapter 3 adjustments could be applied only on the money laundering group, not the bankruptcy fraud group. See U.S.S.G. § 2S1.1 cmt. n.2(C)

3

("Notwithstanding § 1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived."). This application note serves to prevent the double counting that would occur if such enhancements were applied both on the underlying crime and on the money laundering offense. Therefore, in the present case, the enhancement for obstruction under § 3C1.1 could apply only on the money laundering group.

Second, I concluded that the enhancement for sophisticated laundering should not apply. Application note 5 to U.S.S.G. § 2S1.1 states that if "the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline." U.S.S.G. § 2S1.1 cmt. n.5(B). In the present case, no additional conduct supported the enhancement on the money laundering group. The PSR listed the use of shell entities and various bank accounts, but that was the same conduct used to justify the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(9)(C) on the bankruptcy fraud group. Therefore, the enhancement under U.S.S.G. § 2S1.1(b)(3) did not apply. As in Mr. Arthur's case, the government did not oppose these findings. I then turned to defendant's written objections.

### 1. Version of Guidelines

Defendant first objected to the PSR's use of the 2006 version of the guidelines. Defendant argued that, notwithstanding the holding in United States v. Demaree, 459 F.3d 791 (7th Cir. 2006) (stating that advisory guidelines do not implicate the Ex Post Facto

4

Clause), I should consider using the 2000 book, which was more lenient than the 2006 version.[4]  The problem with this argument was that the 2000 book, even under pre-Booker standards, was not the proper version.  This conspiracy, which began in February 2000, continued until October 2002.  In so called straddle offenses, the court uses the book in effect when the offense ended.  See, e.g., United States v. Vivit, 214 F.3d 908, 918 (7th Cir. 2000).  Here, that was the 2001 version, which, on my review, was not more favorable to defendant than the 2006 version on any relevant issue.  Thus, even if I had been inclined to use an older version of the guidelines – and Demaree clearly holds that I need not do that – in the present case it would not have helped defendant.  I therefore overruled the objection.

    **2.**    **U.S.S.G. § 2X1.1(b)(2)**

Defendant next objected to the denial of a 3 level reduction under U.S.S.G. § 2X1.1(b)(2).  That provision provides for such a reduction in a conspiracy case, "unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control."  U.S.S.G. § 2X1.1(b)(2).

Defendant argued that because Mr. Arthur did not pursue the bankruptcy through

---

[4]U.S.S.G. § 1B1.11 provides that the court is to use the version of the guidelines in effect at the time of sentencing, unless doing so violates the Ex Post Facto Clause.  In Demaree, the court held that because the guidelines are now advisory rather than mandatory, the Clause is not violated by the use of the current, more severe version of the guidelines.

5

to discharge, the reduction applied. I disagreed. Defendants completed all of the acts necessary for these crimes; it was only when creditors objected and the trustee became suspicious that Mr. Arthur backed off and agreed to waive discharge. In essence, he got caught, which was why there was no discharge.

In any event, there seemed to be ongoing confusion among the defendants as to what the crime was in this case; the crime was not obtaining a discharge, it was committing a fraud upon the bankruptcy court. That was a crime whether or not the fraud succeeded in improperly wiping away debts.

### 3. Loss Determination

Defendant next objected to the loss determination, claiming that there was no loss because there was no discharge. Application note 3(A) to U.S.S.G. § 2B1.1 clearly states that loss under the guideline is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A). In the present case, defendants intended through their fraud to cause Barbara Doyle to lose her $125,000 judgment, which alone was sufficient to support the $120,000-$200,000 loss range and thus the 10 level enhancement under U.S.S.G. § 2B1.1(b)(1)(F).[5]

### 4. Sophisticated Means

Defendant next objected to the enhancement for use of sophisticated means under 2B1.1(b)(9)(C). Application note 8(B) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment

---

[5]Further, application note 3(A)(ii) provides that intended loss includes intended pecuniary harm that would have been impossible or unlikely to occur. U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

6

of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n.8(B).

In the present case, defendants engaged in precisely the type of conduct described in the application note, using fictitious entities such as Xtant and Greystone to hide assets. Defendant claimed that the conduct was not especially intricate because only a few such shells were used. I disagreed. The guideline does not require a certain number of fictitious entities to support the enhancement. Further, in the present case, defendants created several phony entities and used several different bank accounts. Funds were shuffled between accounts. They also attempted to use the defunct law firm of Arthur and Arthur, and had Runzheimer make payments to various entities to hide Mr. Arthur's income.

Defendant noted that Halco Financial & Realty Corp., another entity mentioned at trial (which apparently held the title to defendants' house), existed prior to the commencement of the fraud and was created to gift assets to defendants' daughter. Perhaps that was the original intent, but that entity too came to be part of the scheme.

Finally, defendant claimed that it would be improper to apply the enhancement for conduct that was nothing more than the same conduct underpinning the bankruptcy fraud. The conduct was not the same. The bankruptcy fraud could have been completed by simply lying on the petition and schedules, and submitting other false documents to the bankruptcy court. The conduct underlying the enhancement went much further in attempting to hide assets and income. I therefore overruled the objection.

###    5.    Use of Special Skill

Defendant's next objection was to the enhancement for use of a special skill under

7

U.S.S.G. § 3B1.3.  The PSR stated that defendant used her skill as a lawyer to file the motion to quash the Runzheimer subpoena filed by one of the creditors.  I agreed that this enhancement should not apply.  It was true that defendant used her legal skill to try to prevent creditors from learning about the Runzheimer income her husband earned. However, in order for the enhancement to apply, the use of a special skill must "significantly facilitate[] the commission or concealment of the offense."  U.S.S.G. § 3B1.3 (emphasis added).  The cited action, which was just one small part of the ongoing effort to conceal Mr. Arthur's income and assets, was not significant.  The motion was apparently denied by the court, and given all of the other efforts at concealment which I documented in my written findings, it was certainly not crucial or essential; I found that this motion "furthered the crime incidentally if at all."  United States v. Holt, 170 F.3d 698, 703-04 (7th Cir. 1999).  Therefore, I did not impose the enhancement.

      **6.  Minor Role**

Defendant also objected to the denial of a reduction for minor role under U.S.S.G. § 3B1.2.  I first noted, consistent with my earlier finding, that any chapter 3 adjustment must be applied on the money laundering group, so as to prevent double counting or double credit.

Section 3B1.2 may be applied in cases in which more than one participant was involved in committing the offense.  It provides a range of adjustments for a defendant who plays a part in committing the offense that makes her substantially less culpable than the average participant.  U.S.S.G. § cmt. n.3(A).  Under § 3B1.2(a), the defendant's offense level may be reduced by 4 if she was "a minimal participant in any criminal activity."  Her offense level may be reduced by 2 under § 3B1.2(b) if she was a "minor participant" in the

8

crime.  A 3 level reduction may be granted for cases falling in between.

Application note 4 indicates that the "minimal participant" adjustment applies to defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.  U.S.S.G. § 3B1.2 cmt. n.4.  Note 5 indicates that a "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5.  The defendant bears the burden of showing by a preponderance of the evidence that she is entitled to a reduction under § 3B1.2.  United States v. Mitchell, 178 F.3d 904, 910 (7th Cir. 1999).

I found that defendant qualified for a 2 level reduction in the present case.  It was clear from the evidence at trial that this was Mr. Arthur's scheme.  He wanted to discharge the Doyle judgment against him.  He was the one who filed the bankruptcy petition and lied under oath.  He created and controlled the fictitious entities and their bank accounts, and made most of the expenditures.  He directed defendant in her participation.

There was no doubt that defendant engaged in conduct to facilitate the scheme, as set forth in my written findings.  I found that she largely understood the scheme.  She was thus not entitled to a 4 level reduction.  But she was significantly less culpable than Mr. Arthur, justifying a 2 level reduction.

### 7.    Obstruction

Defendant's final objection was to the enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  The PSR based the enhancement on defendant's commission of perjury at trial.

9

Section 3C1.1 requires specific intent to obstruct justice, and the prosecution bears the burden of proving by a preponderance of the evidence that the enhancement is warranted. United States v. Ewing, 129 F.3d 430, 434 (7th Cir. 1997). This should include all of the elements of perjury: falsity, wilfulness and materiality. United States v. Brimley, 148 F.3d 819, 823 (7th Cir. 1998). The testimony must be intentionally false, rather than a result of confusion, mistake or faulty memory. See United States v. Dunnigan, 507 U.S. 87, 94 (1993).

I found that the enhancement applied here. Defendant perjured herself at trial in several material respects. First, I found her testimony that she and the other "directors" of Xtant controlled Xtant's bank accounts, rather than Mr. Arthur, and approved all expenditures, to be willfully false. The evidence established beyond a reasonable doubt that Xtant existed for the purpose of holding Mr. Arthur's concealed Runzheimer income, and that he used the money in the Xtant accounts as his own. Defendant lied when she said that she and/or Susan Svoboda controlled the accounts. This testimony was material because, if believed, would tend to show that Mr. Arthur was not hiding and conducting financial transactions with his own personal income in the Xtant account.

Second, defendant falsely claimed that Mr. Arthur's residence was in Virginia, when the evidence plainly showed that his residence was with her in Wisconsin. This testimony was material because, if believed, would tend to negate guilt as to one of the claims of false oath or account in the bankruptcy proceeding. The testimony was willful because defendant obviously knew where defendant lived, with her.

Third, I found defendant's testimony concerning supposed loans she made to Xtant, which she was "taking back" via purchases such as that of the SEA DOO, to be perjurious.

10

There was no evidence of any such loans. Rather, the evidence showed that Xtant was a shell corporation used to conceal Mr. Arthur's income and assets, and to pay personal expenses. Defendant also testified that it was her daughter Elizabeth who accompanied Mr. Arthur to purchase the SEA DOO. I also found this testimony to be false, instead crediting the testimony of Rob Strauss of Rob's Performance Motorsports. Defendant's testimony was material because, if believed, would support the notion that Mr. Arthur was not hiding his personal income in Xtant accounts or engaging in money laundering with this purchase.

Fourth, defendant perjured herself in claiming at trial that she performed legal work for her husband worth hundreds of thousands of dollars prior to the filing of his bankruptcy. Defendant was employed full-time as a nursing home administrator from 1997 to 2004, and I specifically rejected as incredible her testimony that she was during this time also performing such legal work. This testimony was material because, if believed, would tend to negate her guilt of filing a false claim in the bankruptcy proceeding as charged in count sixteen.

For all of these reasons, I found that the enhancement applied.[6]

### 8. Conclusion on Guidelines

Based on the above findings, I computed the offense level as follows. On the underlying bankruptcy fraud counts, the base level was 6, plus 10 for loss, plus 2 for

---

[6]Defendant noted that U.S.S.G. § 2S1.1 cmt. n.2(C) allowed imposition of this enhancement only on the money laundering group, and argued that she engaged in no obstruction regarding such offenses. I found that she obstructed justice on both groups, as described above. Moreover, note 2(C) is designed to be a shield against double counting, not a sword defendants can use to avoid otherwise properly imposed enhancements on the underlying crime.

11

misrepresentation in a bankruptcy proceeding, plus 2 for use of sophisticated means, for an adjusted level of 20. Twenty became the base level on the money laundering group, plus 2 for conviction under § 1956(h). I imposed the 2 level enhancement for obstruction and the 2 level reduction for minor role on this group, as application note 2(C) provides, making the final level 22. Coupled with her criminal history category of I, defendant's imprisonment range was 41 to 51 months

## B. Departure Requests

### 1. Loss Amount Overstated Seriousness of Offense

Defendant's first departure request was under U.S.S.G. § 2B1.1 cmt. n.19(C), which provides that there may be cases where the fraud guideline "substantially overstates the seriousness of the offense." This note has undergone revisions over the years, and previous versions focused on the loss calculation, which really drives the offense level under this guideline. See, e.g., United States v. Forchette, 220 F. Supp. 2d 914, 923-26 (E.D. Wis. 2002) (discussing situations in which loss figure overstates seriousness of the crime).

I concluded that while I was authorized to depart on the basis suggested, I declined to so exercise my discretion here. Defendant stated that under the circumstances of this case, it could be argued that the loss should be zero, because Mrs. Doyle and the other creditors did not end up losing their claims. However, the guideline clearly includes intended loss; it was not proper to depart to simply ignore that requirement.

Defendant cited my decision in United States v. Roen, 279 F. Supp. 2d 986 (E.D. Wis. 2003), for the proposition that a departure may be proper when the intended loss

12

bears no resemblance to economic realty. Roen was inapposite. In that case, the scheme, which generated a substantial intended loss figure, was clearly doomed to fail and could not possibly have caused the amount of loss intended. Here, the loss could have happened had the fraud not been uncovered prior to discharge. Further, the intended loss figure in this case was modest and supported by the Doyle judgment alone, the discharge of which was the impetus for the scheme. Defendant also argued that the enhancements for bankruptcy-related fraud and sophisticated means overstated the offense, but failed to explain how. Therefore, I denied the request.[7]

### 2. Family Circumstances

Defendant's next request was under U.S.S.G. § 5H1.6 based on extraordinary family circumstances. There are three relevant factors in ruling on such motions: (1) the specifics of the family situation, i.e. how many people depend on the defendant and the role she plays; (2) whether a reasonable departure would spare the family; and (3) the purposes of sentencing. United States v. Pearson, 282 F. Supp. 2d 941, 943 (E.D. Wis. 2003).

The instant motion failed on all three prongs. First, defendant presented insufficient evidence as to her role in caring for family members. She stated that her mother cares for her mentally disabled aunt in Pennsylvania, and that her mother was nearing the end of her ability to do so. Defendant stated that she was next in line to fulfill this role. Ordinarily, in cases where departures are granted under this provision, the defendant is already

---

[7]While this may not have been a non-heartland situation under pre-Booker principles, I did consider the end result of this crime in evaluating the seriousness of the offense and defendant's role in it under § 3553(a)(1).

13

providing such care. I did not think it appropriate to depart when the defendant may, at some point in the future, be required to provide care. Defendant had lived in Wisconsin for many years, and there was no evidence of a significant role in providing care in Pennsylvania.

Second, I would have had to depart 12 levels to get to Zone B and allow a sentence of probation. Such a departure would not, under the facts of this case, have been reasonable. Finally, for the reasons stated later in this memorandum, I found that the purposes of sentencing would not be satisfied with a probationary sentence. Therefore, I denied the motion.

### 3. Good Works

Defendant's third departure request was under U.S.S.G. § 5H1.11 based on extraordinary charitable and other good works. Defendant had done a considerable amount of good works, but in the exercise of discretion I denied the motion under this policy statement. I did, however, consider this factor under § 3553(a)(1).

### 4. Coercion

Defendant's final request was under U.S.S.G. § 5K2.12, which allows a departure when the defendant acted under coercion or duress. Defendant stated that she was psychologically manipulated by Mr. Arthur. However, the guideline states that: "Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency." U.S.S.G. § 5K2.12. While I did not doubt that Mr. Arthur was behind this offense and that defendant involved herself at his

14

prodding, there was no evidence that he was physically abusive or threatening. Thus, I could not find that a departure under this provision was proper. I did consider Mr. Arthur's manipulation under § 3553(a), however.

I thus denied all of the departure requests and proceeded to sentencing under § 3553(a).

## C.    Section 3553(a)

In imposing sentence, the court must consider the factors set forth in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the needs of the public and any victims, the types of sentences available, the sentencing guidelines and policy statements, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). The statute directs the court, after considering these factors, to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing – punishment, deterrence, incapacitation and rehabilitation.

### 1.    Nature of Offense

The crimes in this case reflected a deep disrespect for the law, the judicial system and the truth. In sum, Mr. Arthur, with defendant's assistance, tried to discharge his debt to Mrs. Doyle by fraudulently using the bankruptcy system. He obviously believed he was smart enough to get away with it, and went to great lengths to do so, creating phony entities and bank accounts. Defendants then engaged in various financial transactions with the proceeds of the bankruptcy fraud, leading to their conviction of money laundering.

As indicated above, I did not doubt that Mr. Arthur was behind this crime, and that

15

defendant involved herself only at his urging. The vast majority of the fraud was committed by Mr. Arthur, and the conduct in which defendant engaged was directed by Mr. Arthur. Nevertheless, both defendants paid a serious price for this misguided attempt to discharge a simple debt.[8]

### 2. Character of Defendant

In contrast to the shabbiness of the crimes, defendant's character was otherwise outstanding. She was fifty-four years old and had no prior record. She had a distinguished educational and employment record, graduating from law school and going on to serve as a prosecutor, eventually being elected district attorney of Dodge County, Wisconsin.

After a period of time off to raise her child, defendant returned to work as a nursing home administrator at Clearview, a position she enjoyed and at which she excelled. I received numerous letters attesting to the genuine concern defendant showed for her residents and employees, and the good works she did there. For instance, the former chairman of the board of Clearview wrote that defendant had an "unusually strong combination of intellect, joy, and spiritual understanding." He stated that her "ideas and solutions were honest, wise and intelligent." (Def.'s Sen. Mem. Ex. A at 006.) "Kathy's outpouring of love impressed and touched everyone – staff, visitors, patients and their families, and the Board." (Id. Ex. A at 007.) The assistant superintendent of nursing wrote that defendant exemplified everything an administrator should be. "All the staff recognized her intelligence, wisdom, generosity, and integrity. But more telling of her character I believe, was the way she cared about our patients, something that wasn't even really in her

---

[8]I sentenced Mr. Arthur to 54 months in prison.

job description. . . . She continually looked for ways to bring more joy to patients' lives with flowers, special foods, music, and activities." (Id. Ex. A at 008.) The director of nursing wrote that "Kathy was like a breath of fresh air, inspired and inspiring." (Id. Ex. A at 010.) She further stated: "Kathy is really a remarkable person. I have never known anyone more committed, hardworking, energetic, ethical and unselfish." (Id. Ex. A at 011.) A nurse wrote that "Kathy was the reason that Clearview felt different from other places I've worked. I enjoy the mental pictures I have of Kathy kneeling in the garden, planting flowers while carrying on a lively conversation with a patient sitting in her wheelchair." (Id. Ex. A at 012.) Another nurse wrote: "One thing that I admire about Kathy is her sense of beauty. She transformed Clearview from a caterpillar into a butterfly." (Id. Ex. A at 013.) "Kathy went out of her way to remember residents with cards that she created on the computer, chocolates on dinner trays, pumpkins in the fall, small Christmas trees for each room, and beautiful notes to mark the changing of the seasons." (Id. Ex. A at 014.) Defendant's former secretary stated that defendant was "exceptionally straightforward and honest." (Id. Ex. A at 016.) The chef at Clearview wrote that defendant "led us all by her personal example. In addition to all her regular duties, Kathy might be seen at any time pulling weeds, painting a room or arranging flowers, or even putting on an apron and helping out in the kitchen." (Id. Ex. A at 017.) Others said much the same. (Id. Ex. A at 019, 023, 024-25, 026-27, 028-30.)

Defendant also had a significant history of good works in other areas. Circa 1990, defendant and Mr. Arthur began operating a program (called project HEAT) for inner city residents with drug and alcohol problems at an apartment building they owned. The program offered housing, employment and transportation to men willing to commit

17

themselves to getting a job, remaining sober, and staying out of trouble.  (Def.'s Sen. Mem. Ex. D.)  The program was taken over by the Wisconsin Nazarene Compassionate Center in about 1995, and the executive director of that organization, Pamela Eichler, indicated that when defendant ran the program, she "did all of the 'grunt' work at the building" and was "a great role model."  (Id. Ex. A at 021.)  Eichler wrote: "Kathy's unselfish giving is legend in our program, especially since when Kathy started working here gunshots were frequent in our neighborhood.  Kathy actually put her life in jeopardy by confronting drug dealers who tried to set up shop on the corner outside of our building.  She also put her money where her mouth was, routinely funding the program's significant shortfall from her savings."  (Id.)  Eichler further stated that after she took over the program, defendant continued to help and provided free legal advice.

Defendant also helped others at random.  In 1989, defendant met a woman at a conference, a single mother who planned to move from California to Milwaukee, and helped her find housing, made a down payment on the woman's rent, and assisted her in unpacking and enrolling her kids in school.  (Id. Ex. A at 033.)  Defendant also volunteered as a girl scout leader (Id. Ex. A at 037); involved herself in her church (Id. Ex. A at 031-32); and provided nursing care to an elderly man in his home free of charge (Id. Ex. A at 009).

I received positive letters from defendant's mother, daughter, a Dodge County judge, and many other friends and acquaintances.[9]  They depicted someone who is caring, responsible and eager to help others.  Defendant's daughter, Elizabeth, an honor student at Wellesley, wrote that defendant was non-confrontational and extremely loving.  She

---

[9]The court received a total of twenty-two letters, some from individuals who had known defendant for decades.

18

wanted others to be happy and bent over backwards to give them what they wanted. Elizabeth stated that defendant was her best friend and had been an incredible role model for her. (Id. Ex. A at 002-3.) The county judge indicated when she was a prosecutor defendant had a reputation of being hard working, tough, but fair. He stated that she had great community support when she successfully ran for DA against an incumbent. He stated that her reputation in their small community was very good. (Id. Ex. A at 004-5.)

These accomplishments and accolades made defendant's current situation that much harder to understand. How could someone of such high character get involved in fraud, particularly at defendant's age? Defendant provided a psychological report from Dr. Suzanne Lisowski, which provided some insight. Dr. Lisowski wrote that, despite defendant's considerable education and accomplishments, Mr. Arthur dominated her:

> From this examiner's perspective, the resulting image of this marriage is one in which Ron became a "Wizard of Oz" figure, brandishing power and control from behind a screen of inapproachability. As "Ron, the Great and Terrible," Kathleen perceived her husband as a remarkably gifted man with complex talents and abilities markedly superior to her's. She also came to view him as a frightening force of temper who discounted her wishes, ignored her requests, and was impervious to influence. Kathleen would avoid conflict with most anyone, if possible; with Ron, she was both fearful and dependent, and aware that her views held no capacity for persuasion. Her lack of effectiveness in influencing her husband contributed to Kathleen's feelings of inadequacy, which of course inflated her perception of Ron as "great," while Ron's periodic temper outbursts maintained his identity as "terrible."

> In view of these considerations, it is felt that Kathleen's actions and choices regarding the legal matters in focus have likely been consistent with her long-term acquiescence in marriage. Compliant and dependent by nature, intensely uncomfortable with conflict, and uncomplaining as a component of her religious beliefs, Kathleen deferred to her husband's decisions and wishes throughout their marriage, in matters small and large. Perceiving Ron as impervious to the influence of forces far more powerful than herself, Kathleen long ago abandoned hope of having her views or requests honored in marriage, if they conflicted with those of her husband. Throughout the recent years of legal entanglement, Kathleen has maintained her submissive

19

role, powerless to change, persuade, or even believe that she could fully comprehend the complexities of her husband's endeavors.

(Id. Ex. B at 14.)[10]

### 3. Consideration of Guidelines and Purposes of Sentencing

The guidelines called for a term of 41-51 months. Under all of the circumstances, I found that a sentence within that range would be greater than necessary to satisfy the purposes of sentencing.

First, the guidelines did not account for defendant's significantly positive personal characteristics, as reflected in her good works and the many letters I received. As discussed above, defendant made a substantial showing that, under § 3553(a)(1), she deserved sentencing consideration for her good conduct prior to this offense. Given her good character and lack of record, I considered defendant a very low risk of recidivism and someone from whom the public did not have to be protected in any way. Nor did she have any correctional treatment needs.

Second, no one doubted that Mr. Arthur was the driving force behind this crime, and that defendant would not have engaged in such conduct were it not for his prodding. My own observation of defendants' behavior throughout the case confirmed Dr. Lisowski's findings. I found Mr. Arthur to be an extremely narcissistic person, who is convinced that he is always right, is smarter than everyone else, and can use his legal skills to get his way. That defendant deferred to Mr. Arthur was clear. It appeared that during her trial testimony

---

[10]A long-time friend also wrote that Mr. Arthur took "the uncommon path in law and business," always looking for "legal loopholes." "In these matters, Kathy yielded to his expertise. . . . For reasons not understood by me, Kathy has always consistently deferred to Ron in family matters that would be major discussions/arguments in most households." (Id. Ex. A at 039-40.)

she essentially acted as his stand-in.[11] Given his superior role in the criminal conduct and in pressuring defendant's participation, I found that defendant's culpability was nowhere near Mr. Arthur's, and that defendant should receive a sentence far less than his (54 months).[12]

Third, as I noted at Mr. Arthur's sentencing, the money laundering aspect of this case really did not add much in terms of culpability, yet added 2 offense levels to the guideline. See U.S.S.G. § 2S1.1(b)(2)(B). The underlying crime was essentially concealment, and the money laundering largely represented a continuation of that. Thus, under § 3553(a)(1), I did not view the crimes differently based on the money laundering convictions. Further, the guidelines on the bankruptcy fraud group already incorporated an enhancement for use of the shell entities which facilitated the money laundering. See U.S.S.G. § 2B1.1(b)(9)(C). Thus, punishment for this conduct was already incorporated.

Finally, as I also noted at Mr. Arthur's sentencing, ultimately, defendants' crimes did not harm any individual victim. Despite all of the concealment and lies, at the end of the day everyone was left pretty much where they were before defendants committed this crime. Mr. Arthur agreed to waive discharge, and no creditor lost money. Under the guidelines, intended loss counts just the same as actual loss. However, under § 3553(a)(1), I may consider the economic realities of the situation in deciding the ultimate

---

[11]It also came out during Mr. Arthur's sentencing that he coached Svoboda in her perjurious testimony.

[12]It is true that I awarded defendant a minor role adjustment under U.S.S.G. § 3B1.2. However, this was a case where the guidelines did not provide for a proper measure of defendant's role. Under § 3553(a), I tailored the sentence to account for the realities of the situation.

21

sentence.

For all of these reasons, a sentence substantially below the guideline range was sufficient. Defendant requested probation, but such a sentence would have been insufficient. Defendant lied to the bankruptcy court, assisted in hiding assets, refused to accept responsibility for her conduct and perjured herself at trial. A prison sentence was necessary in order to promote respect for the law.[13] The courts cannot be misused in this fashion. Lawyers in particular have an obligation to the truth. I accepted that Mr. Arthur drove this offense, but at some point defendant's own moral compass should have taken over. Finally, I could not conclude that defendant's service as a prosecutor years ago would have any significant impact on the severity of her sentence.

Under all of the circumstances, I found a sentence of 12 months and one day sufficient but not greater than necessary. This represented a significant sanction for a non-violent, non drug-related offense, imposed upon a woman in her mid-fifties with no prior record. This sentence was sufficient to promote respect for the law, vindicate the interests of the justice system harmed by the crime, and deter others. No other purpose of sentencing required a prison term, for the reasons stated. This sentence varied from the guidelines, but this was an odd case and Mrs. Arthur an even more unusual defendant. Thus, the sentence did not create unwarranted disparity.

_____

[13]At sentencing, defendant's current counsel stated that defendant was offered a plea agreement for a misdemeanor prior to trial, and argued that former counsel was ineffective in not being available to advise her to take the deal. To the extent that this was a proper sentencing argument at all, it would have been inappropriate to impose on defendant the non-prison sentence she could have gotten had she not gone to trial and perjured herself.

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 12 months and one day, followed by two years of supervised release, the conditions of which appear in the judgment.

Dated at Milwaukee, Wisconsin, this 22nd day of December, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge